## Commonwealth of Pennsylvania *v.* William H. House, Appellant.

*Practice—Criminal law—Additional instructions in absence of defendant —Adjournment.*

It is reversible error where the trial judge, after adjournment of court, permits the jury to come in for additional instructions which he gives in the absence of defendant and his counsel and without notice to either. A person under trial for a crime has the right to be present during the entire trial; he has a right to assume that no further instructions will be given during the adjournment of court. No waiver or consent can be implied from his absence under such circumstances.

While the court has the discretionary power to recall the jury for fur-

ther instructions or to withdraw or to correct erroneous instructions such instructions should be given in open court.

*Evidence—Criminal law—Proof of independent crime, when admissible.*

Generally evidence of the defendant's commission of another distinct and independent crime cannot be received for the purpose of proving his commission of the offense for which he is being tried; yet under some circumstances such evidence may be given: To establish identity; to show that the act charged was intentional and wilful, not accidental; to prove motive; to show guilty knowledge and purpose, etc.

*Evidence—Criminal law—Pertinent cross-examination.*

Evidence being given by defendant, charged with embezzlement of public funds, that his alleged false representations made to the officers of the city were innocently, if mistakenly made, it was competent for the commonwealth to cross-examine him on this subject and admissions, made by him, that he was receiving interest on the money in question from banks of deposit, are relevant testimony as tending to rebut the theory of mistake set up in his direct examination, and as tending to show a personal interest to be served in making the false and misleading statements and in withholding the money.

*Evidence—Criminal law—Scope of cross-examination of defendant.*

Where defendant in a criminal case goes upon the stand, admissions made by him are not inadmissible because elicited under cross-examination; by consenting to take the stand and by swearing to tell the truth, the whole truth, he waives his constitutional privilege and may be cross-examined, not only the same as any other witness, but he cannot object to legitimate cross-examination upon the ground that his answers will tend to criminate him.

*Evidence—Criminal law—Testimony of defendant at former trial admissible.*

The testimony of defendant can be used against him on a second trial of the same indictment even if he elects not to go upon the stand. His constitutional privilege as far as that testimony is concerned has been waived, and cannot be reclaimed in any subsequent trial of the same indictment.

*Evidence—Testimony of former trial—Method of proof—Practice, C. P.*

The proper method of proving what was said by a witness on a former trial is by the official stenographer.

*Evidence—Criminal law—Proof of admissions on former trial.*

When the commonwealth desires simply to prove certain admissions of a defendant made on a former trial, it is not necessary to put in evidence his whole testimony; but if anything is omitted which may tend to explain or qualify those admissions the defendant may call it out upon cross-examination.

Argued Oct. 18, 1897.   Appeal, No. 32, April T., 1898, by defendant, from judgment of Q. S. Allegheny Co., June Sess.,

1896, No. 452, on verdict of guilty. Before RICE, P. J., WICK-
HAM, BEAVER, REEDER, ORLADY, SMITH and PORTER, JJ.
Reversed.

Indictment for embezzlement of $26,652.74. Before KEN-
NEDY, P. J.

It appears from the record that defendant was indicted in the
court below on numerous counts charging him with embezzle-
ment as a municipal officer, jointly with W. C. Moreland, who
had been for many years city attorney of the city of Pittsburg.

At the trial of the case all the counts were abandoned ex-
cepting one charging that the said defendant did embezzle the
sum of $26,652.74, in aiding and abetting and as accessory to
the unlawful conversion and embezzlement of the said sum.

On the trial of the case the commonwealth was permitted,
under objection, to examine L. W. Mendenhall, the official ste-
nographer of the court, in regard to the testimony of the defend-
ant taken at a previous trial (see former report of the case, 3
Pa. Superior Court, 304), the defendant having at the second
trial declined to take the stand.

The examination of the witness Mendenhall was as fol-
lows: [L. W. Mendenhall, sworn. Direct examination by Mr.
Yost: "Q. You are the official stenographer of common pleas
No. 3? A. I am. Q. And by virtue of that office you were
official stenographer at the former trial of this case? A. Yes,
sir. Q. Did you take notes of the testimony of the case?
A. I did. Q. Did you take notes of the testimony of William
H. House, the defendant, on the former trial of this case?
A. I did. Q. Will you look at your notes of the testimony of
the defendant, House, at the former trial, and tell us what he
stated in regard to the duties of his office?"

Mr. O'Brien: Objected to, on the ground that if they have
any right to offer the testimony, they must offer the testimony
complete; they have no right to offer a part of it in that way.

Mr. Yost: I propose to prove the admission of the defendant
as to his duties during the period covered by this indictment,
and his relations to the principal and codefendant, Moreland.

Mr. Patterson: We object, as the act of assembly, section 3,
of the act of 1887, expressly provides the use of the testimony
for another trial, and we object to it on the ground that the only

knowledge the witness has upon the subject upon which he is interrogated is what he derived as official stenographer in taking the testimony at the former trial of this defendant upon the same charges, and that it is not allowable on the part of the commonwealth to prove against the defendant on trial his testimony taken at a former trial of the same cause.   2. That the witness, being capable of testifying only in his capacity as a reporter in the other case, should be called upon, if at all, to give his entire version of Mr. House's complete testimony at that time, if it is competent to prove it at all.   It is incompetent and improper to allow the representative of the commonwealth to select particular parts of that testimony, which they may regard as incriminating, and have that detailed without giving the entire testimony.

By the Court: The objection is overruled.

To which ruling of the court counsel for defendant request an exception.   Exception allowed and bill sealed.

" A. The following question was asked Mr. House : I wish you would tell the jury, in a general way, what the line of your duty was there from the time you first went in under Mr. Bigelow, until you ceased in October, 1895 ?   To which he made this reply : Why, to receive assessments on streets, grading, paving and curbing, sewers, openings, damages by grading, to pay parties who were entitled to money, pay the city treasurer, grading, paving, curbing and sewers, or any other moneys that might come into my hands that he was entitled to receive."

" Q. State if he was interrogated, Mr. Mendenhall, as to his method of satisfying liens in the court house in the prothonotary's office, and what he said upon that subject."

" A. He was asked the question : Then who paid the costs ? To which he made this reply : Then I would make out a list —I might have one, or I might have a dozen names—and I would go to the prothonotary's office and satisfy these liens, W. C. Moreland, per House, and pay the costs; or I might have forty or fifty, and I would go in to the prothonotary's office, and I would leave a list with him, and tell him to write up the satisfactions, and I would go in there the next morning, before working hours—maybe I would be in there before eight o'clock, and I would sign my name, and pay him the costs on the whole thing."

" Q. Was he asked anything further immediately after that in regard to costs ? "

" A. He was asked this question: And were the costs usually paid in currency? To which he made the following answer: Yes, sir, always, I don't recall just now of any ever having been paid by check, although there might have been some costs, but my recollection tells me that I always paid the costs in money."

" Q. Could you state whether he was asked how he paid damages, whether by check or not, how they were drawn and what he said upon that subject?

" A. The following appears on my notes: Now, when you paid damages by check, how were the checks drawn? To which he replied: The checks were signed by W. C. Moreland. Q. In blank? A. To the order of W. H. House; when I paid those checks out I would indorse them over to the parties that were entitled to the money."

" Q. Later on, you may state whether or not he was interrogated as to how frequently he was at the office, and whether he had charge of Moreland's bank book, and tell us what he said upon that subject. A. The following appears: Q. You were there every day at the office, weren't you? A. I was there every day, as a general thing: I might have been away or something of that kind. Q. You had charge of the bank books containing the accounts of W. C. Moreland with these various banks? A. They were in the office; yes, sir. Q. They were not in Mr. Moreland's private office, in the St. Nicholas building, but in the office you occupied? A. Yes, sir. Q. You sent or took these books to banks as the moneys were deposited. A. Yes, sir. Q. And you had them balanced, did you? A. Yes, sir. Q. And you had full access to them, so that you could see exactly what they contained? A. Yes, sir."

" Q. State whether towards the conclusion of his cross-examination he was interrogated as to deposits of the moneys he received, and as to how he did it and what he said upon that subject. A. I find this in my notes. Q. Mr. House, you have said that you deposited the funds coming into the city attorney's office, under your supervision, and prepared the deposit slips in the name of W. C. Moreland alone? A. Yes, sir. Q. In the First National bank of Pittsburg, the Allegheny

National bank, the Tradesmen's, and the Freehold? A. Yes, sir. Q. In 1893, is it not a fact that in the Tradesmen's, Allegheny National, and First National, at the time you told Mr. Gourley that about all the money you could pay in was $30,000, that there were quarterly balances there in each bank of at least fifty to eighty thousand dollars? A. There might have been. Q. That there were quarterly balances in those banks to the amount of one hundred and fifty or two hundred thousand dollars? A. Well, I couldn't say as to the amount. Q. Well, it would aggregate in that neighborhood; you had deposited the greater portion of that money in those banks by the direction of Major Moreland? A. Yes, sir."

" Q. In that immediate connection state whether or not he was interrogated as to whether he drew interest upon these moneys that were in bank, and what he said upon that subject."

Mr. Patterson: Objected to, not only upon the grounds already stated, but that this particular question now asked is incompetent and irrelevant, for the reason that it seeks to draw from the witness a former statement of the defendant relating to an entirely distinct and different offense from that upon which he is upon trial, and an offense which is shown by the records of this court to be the subject-matter of three or four indictments against the defendant and W. C. Moreland, only one of which has been disposed of, and the other three are still pending; and it is an offer of matter not contained in notice furnished the defendant by district attorney in his bill of particulars.

By the Court. Objection overruled.

To which ruling of the court counsel for defendant request an exception. Exception allowed and bill sealed.

" A. The following question was asked Mr. House: Q. Mr. House, did you not yourself, quarterly, within the four years prior to the finding of this bill of indictment, regularly draw interest on those deposits which I have mentioned? A. Not all of them. Q. In the Tradesmen's National bank, didn't you draw interest down until January, 1895, on the deposits remaining there? A. I don't know whether it was that month or not. Q. Well, about that time? A. Well, I couldn't say that; it might have been. Q. Well, in the fall of 1894, the quarters for drawing interest were January, April, July and October, weren't

they? A. Yes, I believe there was interest drawn. Q. Well, didn't you in July and October, 1894, and on the first of January, 1895, draw three per cent interest, or about three per cent interest on that balance deposited there? A. Well, I may have done so. Q. Down to February, 1895, do you know the fact that there was a balance deposit of $40,000 in the First National bank, or about that? A. There might have been; I don't recollect. (Book shown witness, and he states) : Yes, that seems to be correct. Q. Didn't you draw the quarterly interest on that, both in October of 1894, and January 1 of 1895, or about those dates? A. Well, I may have done it. Q. You did draw interest about that time? A. Yes, I went there and got interest. Q. What per cent at the First National? A. I couldn't tell that. Q. What at the Tradesmen's. A. I don't know that. Q. Do you know what per cent at the Allegheny National? A. I do not. Q. You drew the interest there also did you not, down until about July of 1895, at the Allegheny National? A. Well, I couldn't say that. Q. There was a large deposit still there on the 1st of July, 1895, was there not? A. There might have been. Q. Well, didn't you go there and draw interest on whatever deposit was there down until July, 1895? A. I couldn't say that I did. Q. Can you say absolutely that you did not? A. No, sir, I can't. Q. There were large deposits almost daily in the Allegheny National down until September of 1895, was there not? A. Yes, sir. Q. Running from one thousand to three or four thousand dollars at a time? A. Yes, sir, just as it is represented there. Q. Now, isn't it a fact that down until the July quarter for drawing interest, you drew interest from the Allegheny National? A. Well, sir, I couldn't say whether I did or whether I did not. Q. Well, you know that you did draw there in 1894 and 1895, don't you? A. Oh, yes, there was interest drawn. Q. And by you? A. Yes, sir. Q. It was drawn regularly as the quarters came? A. Well, I rather think it was."] [2]

It further appears from the record that on the afternoon of May 6, 1897, after the court had adjourned, the following proceedings were taken, to wit: The jury having been recalled in response to a message from them that they could not agree, the court addressed them as follows:

[I have received your communication stating that it is im-

possible for you to agree. The case has been tried twice, and, as you know, at considerable expense to the county, and I do not think I can discharge you until you have made further effort to agree. It strikes me as a case in which you ought to be able to reach a conclusion without very great difficulty, and I think it is my duty to say to you that, while no juryman should sacrifice his individual opinion, yet it should be a matter of careful consideration with the minority, if small, as to whether or not they may be mistaken. Now, it seems to me the best thing we can do for you is to give you a little more comfortable quarters than you have now, and send you back for further honest efforts. to. agree, taking the suggestion I have made to you. I have no idea how you stand; it is not proper for me to know. I only suggest that those of you who are in the minority consider carefully whether or not you are mistaken. I am told your room is not very large, and there are larger rooms in the upper story of the courthouse, used by jurors in capital cases, which are most comfortable, and where there are cots upon which you may rest. We will send you there for further deliberation of the case.

- By a juryman. Q. What bearing has the collection of interest on this case?

By the Court: It has a bearing upon the motive of the defendant. This, I thought was fully explained at the time of the admission of the evidence upon that point, and subsequently in the charge. You understand that you cannot, under this indictment, convict him of the embezzlement of that interest, but it has a bearing upon the motive of the defendant and his relation to the principal, Moreland, who has already plead guilty to the charge. If there are any other questions which you have to ask, I will try to answer them; and I believe, if you make vigorous efforts, you will be able to agree. It is not desirable to have to try the case over again. It was very carefully and ably tried upon both sides, and I think as much light shed upon it as there could ever be in the future, and I think it has had as good a jury as we would be able to get. Now, as I have said before, we will find you more comfortable quarters, where you will be able to discuss the case more calmly and comfortably together. The room I have suggested in the third story, where there are cots, will be ready for you in a few moments, and we will send you there.

By a juryman: Q. Your honor, are we to take into consideration only whether House aided or abetted Mr. Moreland in the embezzlement of that $26,000?

By the Court: Yes, that amount, or any portion of it; that is, whether he aided or abetted Moreland in the act; if he did, he is guilty under this indictment. Now, gentlemen, you may retire.] [3]

The foregoing proceeding took place on Thursday afternoon May 6, 1897, after the jury had been out about twenty-four hours and after the court had received a note from the jury, signed by the foreman, stating that it was impossible for them to agree, and asking to be discharged. Neither the defendant nor his counsel were present.

I hereby certify the foregoing to be correct. John M. Kennedy, P. J.

[I further hereby certify, that at the time the foregoing proceeding took place, the court had adjourned for the day, such adjournment having taken place shortly after 2 o'cock; that before the presiding judge had left the courthouse, and during the usual court hours, viz: about 3 o'clock, he received the note referred to in the foregoing certificate, when he immediately ordered the jury to be brought into the court room, which was still open, and the foregoing proceeding took place. The district attorney and other attorneys and persons were present; neither the defendant nor his counsel were notified to be present. Subsequently, and before 4 o'clock, the regular hour for adjournment, the jury returned into the court room, with their verdict, and defendant's counsel being sent for, the verdict was taken in their presence. John M. Kennedy, P. J.] [1]

The jury subsequently found a verdict of guilty as indicted on the count of the indictment designated as A on the margin thereof, and recommended him to the extreme mercy of the court.

On June 7, 1897, the court sentenced the defendant in open court to pay a fine of $1,000 to the commonwealth, the costs of prosecution, and undergo imprisonment in the Western Penitentiary of Pennsylvania for a period of two years. Defendant appealed.

*Errors assigned* were (1) To the proceedings taken on the

afternoon of May 6, 1897, in the absence of the defendant and his counsel, and without any notice to them, or any of them, after the jury had been charged by the court, and had remained out, engaged in their deliberations, about twenty-four hours, and the time when, and the circumstances under which, they were taken, are set forth in the following certificate of Hon. John M. Kennedy, presiding judge, before whom the case was tried, and the said proceedings were taken, to wit: reciting said proceedings.   (2) In overruling defendant's objections to the testimony of L. W. Mendenhall, which testimony, in so far as it is alleged to be injurious to the defendant, together with the objections thereto, was as follows, to wit: reciting same.   (3) In refusing to discharge the jury on the afternoon of May 6, 1897, upon receiving their communication that it was impossible for them to agree, and in what was said to them in connection with said refusal, to wit: reciting same.   (4) In entering judgment upon the verdict, which verdict was manifestly secured by the instructions hereinbefore set forth and referred to in the third assignment of error.

*Chas. A. O'Brien* and *D. F. Patterson*, with them *Chas. W. Ashley*, for appellant.—A very grave question is raised by this record as to the constitutional rights of the defendant, and the proper method of procedure in criminal trials.   The decision of this court on the matters here involved will certainly establish an important precedent for the guidance of courts of criminal jurisdiction in their interpretation of the meaning of the 10th section of the bill of rights, as actually applied in the trial of causes.

In Prine v. Com., 18 Pa. 103, it was held that a defendant could not waive his right to be present at his trial for felony. But subsequently, in the case of Lynch v. Com., 88 Pa. 189, it was decided that a defendant, on trial for larceny, might waive his right to be present on the taking of the verdict, by voluntarily absenting himself, being out on bail.   Whatever distinction may exist as to the defendant's right of waiver in felony and misdemeanor, there certainly is no longer any doubt of the defendant's right to be present and to be heard by himself and his counsel at all stages of his trial whether for felony or mis demeanor: Stewart v. Com., 117 Pa. 378.

The conduct of the learned trial judge was a denial of the constitutional right of the defendant, which he had not waived, but vigorously and consistently asserted and maintained. There is a striking uniformity of decision in all the states, that it is a fatal error in a criminal cause for the trial judge to hold private communications with the jury concerning the case submitted to their determination: Wade v. The State, 12 Ga. 25; McNeil v. The State, 47 Ala. 498; Kirk v. The State, 14 Ohio, 511; Collins v. The State, 33 Ala. 434; Thompson and Merriam on Juries, sec. 355.

The rigid rule contended for here extends not only to criminal cases, but has been almost universally applied to civil cases as well. Notable among these is Sargent v. Roberts, 18 Mass. 337; Plunket v. Appleton, 41 N. Y. Superior Ct. 159; O'Brien v. Ins. Co., 38 N. Y. Superior Ct. 482; Merrill v. Nary, 92 Mass. 416; Bunn v. Croul, 10 Johns, 239; Bank v. Mix, 51 N. Y. 558; O'Connor v. Guthrie, 11 Iowa, 80.

With respect to the second assignment of error, it seems clear that the testimony of House as taken at the former trial could not be offered against him at this trial under the provisions of sec. 3 of the Act of May 23, 1887, P. L. 158.

The commonwealth were allowed to call the stenographer who reported the former trial, and were allowed to prove by him that House made certain admissions, at the former trial, which he reduced to writing at the time, and he was allowed to read to the jury such portions of the writing as counsel for the prosecution chose to select. This procedure amounted to the actual introduction of selected portions of House's testimony at the former trial, which is even more objectionable than the admission of his entire testimony.

We ask the court to consider the point made at the former hearing of this case (3 Pa. Superior Ct. 304), that the testimony offered was wholly irrevelant to this issue to prove that House received interest on the quarterly balance on Major Moreland's bank accounts. We again urge upon the consideration of the court that such receipt of interest on public funds improperly continued on deposit, does not tend in the slightest degree to establish the charge that House aided Moreland in the embezzlement of public funds; and, moreover, that the admission of such evidence renders him liable to be convicted of two distinct offenses for the same act.

*John C. Haymaker*, district attorney, with him *John S. Robb*, *William Yost* and *C. A. Fagan*, for appellee.—As to the first assignment of error the principle to be deduced from the cases seems to be a sound one. If the jury, after an adjournment, put a question, respecting the facts of the case, to the court, it will be irregular to state the evidence relating to it; but if they desire instructions upon a mere question of law, that may be answered. It should undoubtedly be answered in such way that the parties may have an opportunity to have it corrected, if there is any error in the answer, and in this way all the rights of both parties are secured as effectually as if the answer was given in open court: Thayer v. Van Vleet, 5 Johns, 111; Bunn v. Croul, 10 Johns, 239; Allen v. Aldrich, 29 N. H. 66; Goldsmith v. Solomons, 2 Strobh. L. 296; Thompson & Merriam on Juries, 423; School District v. Bragdon, 23 N. H. 516; Shapley v. White, 6 N. H. 172; Davis v. State, 14 Ind. 358; State v. Dudoussat, 47 La. Ann. 977.

The case of Lynch v. Com., 88 Pa. 189 settled the right of the court, in a larceny case, to take the verdict of the jury in the absence of the defendant; and also to pronounce judgment upon him, while absent.

On this point the following cases were also cited: Meece v. Com., 78 Ky. 586; State v. Pike, 65 Maine, 111; Gandolfo v. Ohio, 11 O. 114; Com. v. Kelley, 165 Mass. 175; Cooper v. Morris, 48 N. J. L. 607.

The question embraced in the second assignment of error appears to be within the limits of legitimate cross-examination of a party, as indicated in the character of the issue: Com. v. House, 3 Pa. Superior Ct. 304. The identical question has been ruled by the Supreme Court in Com. v. Doughty, 139 Pa. 383.

There was no error in what was said in connection with the refusal to discharge the jury: Allen v. United States, 164 U. S. 492.

In urging a jury to agree it is not error to comment on the expense of the trial and to set forth that the public interests would be served by an agreement: State v. Gorham, 31 Atl. 845; Johnson v. State, 60 Ark. 45; State v. Garrett, 57 Kansas, 132; Jackson v. State, 91 Wis. 253, 47 La. Ann. 977; Cox v. Highley, 100 Pa. 249.

OPINION BY RICE, P. J., December 13, 1897:

The general proposition that the testimony of a defendant cannot be used against him on a second trial of the same indictment, if he elects not to go upon the witness stand, is not strongly urged in the present case, and is not well founded upon principle or authority. He cannot be compelled to give evidence against himself, but if he gives it voluntarily he cannot object to having it used against him. His constitutional privilege, as far as that testimony is concerned, is waived, and cannot be reclaimed in any subsequent trial of the same indictment. As was said in Com. v. Doughty, 139 Pa. 383, his admissions or declarations would be evidence against him; and if so why not his testimony under oath?

Nor, where the commonwealth desires simply to prove certain admissions of a defendant made upon a former trial, is it necessary to put in evidence his whole testimony; but if anything is omitted which may tend to explain or qualify those admissions the defendant may call it out upon cross-examination. See Calhoun v. Hays, 8 W. & S. 127; Thomas v. Miller, 151 Pa. 482. This was the course pursued in the present case, and it is not claimed that the jury did not have before them all of the testimony, favorable to the defendant, which he gave upon the former trial concerning the subject-matter of the alleged admissions.

The method of proving by the official reporter what was testified to was proper and in accordance with well settled practice: Wh. Cr. Ev., sec. 231; and this too although the stenographer did not recollect the testimony independently of his notes: Rhine v. Robinson, 27 Pa. 30; Brown v. Com., 73 Pa. 321.

Some of the admissions put in evidence by the commonwealth were elicited upon the cross-examination of the defendant, and it is argued that proof of them was not admissible upon the present trial, (1) because they were irrelevant; (2) because they were made in answer to questions which were not within the legitimate scope of cross-examination, and were objected to at the time. Both of these objections were raised when the case was here before, and were overruled: 3 Pa. Superior Ct. 304. At the earnest request of the defendant's counsel we have carefully reconsidered the ruling, and see no reason for coming to a different conclusion. Were the facts testified to relevant to the issue? Was the cross-examination proper, or was it an

infringement of the defendant's constitutional privilege not to give evidence against himself? In determining the latter question the case must be looked at as it was presented when the testimony was given. The defendant has no right to have that question reconsidered in any other light. This requires a brief review of what preceded the defendant's cross-examination.

W. C. Moreland was city attorney, and the defendant was his regularly appointed assistant. It was the defendant's duty to collect assessments for grading, paving, curbing and sewering, and assessments of benefits upon the opening of streets and the like, and to pay the money so collected to the city treasurer, or to parties awarded damages in the proceedings referred to. The money thus collected, or at least a large portion of it, was deposited by him in four banks to the credit of the personal account of Moreland. As a general rule, payments to the city treasurer and other parties were made by checks drawn by Moreland to the order of the defendant. The defendant had charge of, or access to, the bank books, and at all times had full knowledge of the condition of the accounts. The defendant was jointly indicted with Moreland under the 65th section of the Act of March 31, 1860, P. L. 400. Moreland was charged with having converted over $26,000 of the public funds to his own use, and with being a defaulter as to the same, and the defendant was charged with aiding and abetting and being accessory to the act of Moreland. Moreland pleaded guilty, and on the first trial of the defendant, as well as upon his second trial the commonwealth proved, amongst other things, that the defendant made false representations to the city officers, and to others entitled to receive the money as to the reception of the money and as to the amount on hand that could be paid into the city treasury. Persons to whom damages had been awarded in street opening cases and the like were put off with the false representation that the benefit assessments had not been paid in, and proof was given of false statements made to the city controller as to the amount on hand that could be paid into the city treasury. We need not recite the evidence upon this subject in detail. It is sufficient for present purposes to say that it was ample, if unexplained, to warrant an inference of fraudulent intent. On the first trial the defendant attempted to meet this evidence either by denial, or by explanation to the effect, that, although he might have made mistakes,

yet, if any of his statements were untrue, they were not made with intention to mislead or deceive. To lend plausibility to this theory he asserted directly, and by inference, that he was a mere subordinate, acting simply for his superior officer in depositing and paying out the money, and that he had no personal interest or motive for deceiving any one with regard to the reception of the money, or the amount on hand. There can be no question that the representations made by him were efficient in the consummation of the embezzlement charged in the indictment, and it was of the highest importance to him to convince the jury that they were innocently made. His assertion that he had no interested motive for making false statements, if believed by the jury, would have been strongly corroborative of his other assertion that he had not intentionally misrepresented the facts. It, therefore, was competent for the district attorney to cross-examine him upon this subject. This elicited the admission, that, at the time when the defendant was making these statements to the city controller and others as an excuse for not paying over these public moneys, he, personally, was receiving quarterly interest on the same, from the banks in which they were deposited. This admission strongly tended, not only to rebut the theory of mistake set up in his direct examination and thus to discredit him as a witness, but also to show that he had a personal interest to be served in making the false and misleading statements, and in withholding the money, This was pertinent cross-examination: Fulmer v. Com., 97 Pa. 503.

Incidentally, the defendant's admission tended to show a violation of the 63d section of the act of 1860 which prohibits officers from entering into any contract or agreement with any bank by which such officer is to derive any benefit, gain or advantage from the deposit with such bank of any money which may be in his possession or under his control by virtue of his office. This is a distinct and independent offense, but it does not necessarily follow that proof of it was inadmissible on the trial of the indictment framed under the 65th section. It might, or it might not be, according to the circumstances of the particular case on trial. Generally, evidence of the defendant's commission of another distinct and independent crime cannot be received for the purpose of proving his commission of the

offense for which he is being tried. Yet under some circum-
stances such evidence may be given. " Thus it may be to es-
tablish identity; to show the act charged was intentional and
wilful, not accidental; to prove motive; to show guilty knowl-
edge and purpose, and to rebut any inference of mistake; in
case of death by poison, to prove the defendant knew the sub-
stance administered to be poison; to show him to be one of an
organization banded together to commit crimes of the kind
charged; and to connect the other offense with the one charged,
as part of the same transaction : " Goersen v. Com., 99 Pa. 388 ;
Wh. Cr. Ev. sec. 53; Com. v. Johnson, 133 Pa. 293 ; Com. v.
Tadrick, 1 Pa. Superior Ct. 555; Com. v. Bell, 166 Pa. 405 ;
Com. v. Cover, 6 Cent. Rep. 585; Turner v. Com., 86 Pa. 54 ;
Ferrigan v. Com., 44 Pa. 386 ; Kramer v. Com., 87 Pa. 299.
If, for example, one indicted for breaking and entering a dwelling
house with intent to commit the felony of larceny should admit
the breaking but should deny the intent, I take it that upon
cross-examination he could be asked if he did not commit the
larceny. The cross-examination in the present case was as per-
tinent to the matters testified to in chief as would be the cross-
examination in the case supposed.

It was earnestly argued, when the case was here before that
the court erred in refusing the request of the defendant's coun-
sel to instruct him that it was his privilege to decline to answer
the questions, if his answers might tend to criminate him. The
court committed no error in refusing this request. The defend-
ant is a member of the bar, and must be presumed to have
known his rights. The privilege was not claimed by him but
by his counsel for him. But we do not put our ruling upon
that ground. We are of opinion, that, even if the defendant
had personally asked to be excused from answering the ques-
tions, the court would have been justified in overruling his
request. A defendant in a criminal case cannot be compelled
to testify, and under our statute no inference can be drawn from,
nor comment be made on, his failure to do so. But by con-
senting to take the stand, and swearing to tell the truth and
the whole truth he waives his constitutional privilege, and may
be cross-examined in the same manner as any other witness.
There is this difference, however, between an ordinary witness,
and a defendant testifying in his own behalf; the former goes

upon the stand by compulsion, the latter voluntarily. Having waived his constitutional privilege to keep silent, he cannot give testimony which makes in his favor, and then object to legitimate cross-examination, upon the ground that his answers will tend to criminate him. This doctrine is supported by the great weight of authority: Wharton's Cr. Ev. secs. 432, 470 ; State v. Witham, 72 Me. 531 ; State v. Thomas, 98 N. Carolina, 599 ; People v. Connors, 50 N. Y. 240 ; Com. v. Nichols, 114 Mass. 285 ; Com. v. Tolliver, 119 Mass. 312. See also 9 Cr. L. Magazine, 306 ; State v. Ober, 52 N. H. 459.

The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests, which the law has devised for the discovery of truth. It is not easy for a witness, who is subjected to this test to impose on court or jury; for however artful the fabrication of falsehood may be, it cannot embrace all the circumstances to which a cross-examination may be extended: 1 Gr. Ev. sec. 446. There is good reason for not making the test less rigid where the witness is a deeply interested party. The extent to which a defendant in a criminal case may be subjected to this test is a question upon which the authorities do not wholly agree. In some of the states of the Union it is held that he may be cross-examined as to the whole case ; in others that the cross-examination should be confined to facts and circumstances connected with matters stated in the direct-examination. In either view of the right of cross-examination, the court did not transgress the rules of evidence, nor violate the defendant's constitutional right, by holding, that the questions were pertinent to the matters stated in his direct examination and that it was his duty to answer them. The facts admitted were pertinent to the issue, and the admissions were not obtained by illegal compulsion.

The second assignment of error is overruled.

Plainly stated, the question raised by the first assignment of error is, whether the defendant in an indictment for a misdemeanor can be denied the right to be present when the court charges the jury in his case, and the conviction be sustained? We use the word " denied " advisedly, for while the defendant was not forcibly excluded from the court room, and while there is not the slightest evidence or intimation that the learned and

impartial trial judge intended to deprive him of any legal right, yet the practical effect of his calling the jury into the court room, after the court had regularly adjourned for the day and then advising them as to their duties as jurors, and instructing them as to the law of the case, in the absence of the defendant and his counsel, and without any effort to notify them to be present was to deny him the right to be present. He was not bound to remain in the court room after the court had adjourned for the day. He had a right to presume that no further instructions would be given to the jury, either there or elsewhere, during the adjournment. No waiver or consent can be implied from his absence under the circumstances stated in the bill of exceptions. He must be considered "as standing upon all his legal rights and waiving none of them;" and one of them was the right to be present either in person or by counsel when his case was being tried. We cannot conceive of a trial for a crime resulting in forfeiture of the citizen's liberty where the law, or the court in the administration of it, can deny him the privilege of being present. The right is inherent in the very nature of the proceeding, and, moreover, is secured to him in the fundamental law. "It is his right to have everybody know for what he is tried, and why he is condemned, and to witness the tone, manner, and temper of his prosecution, that he may be subjected to no other influence than truth and law; nor is he bound at all to trust the court or the judge in this matter. It is his great privilege, and no power can impair it:" Kirk v. State, 14 Oh. 511. Although the accused may waive the right to be present in misdemeanors, yet the court cannot deprive him of it. Nor can its action in doing so (however well intended and however free from arbitrariness) be justified by balancing probabilities as to the injury done to him in the particular case.

"In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face" is the language of our Declaration of Rights, and by fair implication it secures the right to be present, not only when the witnesses are testifying, but also when the jury are being instructed as to their duties, and as to the facts and law of the case. For, how can he be heard, if neither he nor his counsel has an opportunity to be present? To deprive him of this priv-

ilege is, of itself, error, if the instructions, although free from error, might have influenced the verdict against him. Such error cannot be wholly cured by putting the instructions in writing after the rendition of verdict and allowing the defendant an exception; for, if he or his counsel had been present, explanatory instructions might have been asked and given, which, for aught we know, might have produced a different result. This consideration, alone, shows the importance of the right secured to the accused, if, indeed, argument be needed to prove it.

It seems hardly necessary to say, that instructions given to a jury after they have retired to deliberate upon their verdict, of the character of those embraced in the bill of exceptions, are as much a part of the trial as the original instructions. The reasons why the accused should have the privilege of being present are as vital in the former case as in the latter. As was said in a New York case, where this question was considered, they may "influence the verdict quite as much, if not more, than the instructions given before the jury retired:" Maurer v. People, 43 N. Y. 1. We may fairly assume that they had an influence upon the verdict in the present case; for, although the jury had been out for twenty-four hours, they agreed upon a verdict within an hour after the additional instructions were given. We are not to be understood as intimating, even, that the presiding judge brought any improper influence to bear upon the jury, or that the instructions were erroneous in themselves. The question does not turn upon the legal correctness or incorrectness of the instructions, but upon the right of the trial judge, during the adjournment of court, in the absence of the accused and his counsel, and without attempt to notify either of them to be present, to give any instructions that might influence the jury to bring in a verdict against him.

So important to the accused is this right to be present when his case is being tried, that it was at one time held that neither he nor his counsel could waive it in any felony case. "It is undoubtedly error," said Chief Justice GIBSON, "to try a person for felony in his absence, even with his consent. It would be contrary to the dictates of humanity to let him waive the advantage which a view of his sad plight might give him by inclining the hearts of the jurors to listen to his defense with

indulgence.   Never has there heretofore been a prisoner tried
for felony in his absence: " Prine v. Com., 18 Pa. 103.   The
Supreme Court modified this ruling, so far as it applied to the
felony of larceny, to the extent of holding that " voluntary ab-
sence when the verdict is received is an error of which he can-
not complain: " Lynch v. Com., 88 Pa. 189.   Possibly there
should be the same modification of the rule laid down by Chief
Justice GIBSON in other felonies triable in the quarter sessions.
Be that as it may, in this case the defendant's absence was not
voluntary.   He consented to nothing and waived no right; and
no Pennsylvania case has held, or, as we firmly believe, ever
will hold, that a defendant, whether indicted for a felony or a
misdemeanor, can be tried in his absence, unless he has ex-
pressly or impliedly waived the right to be present.

Unquestionably the court has discretionary power, of its own
motion, to recall the jury and give them further instructions, or
withdraw or correct erroneous instructions.   As far as we are
informed the usage of the courts of the commonwealth has been
to give such additional instructions only in open court, and this
is the safer and the better practice.   At all events this much is
established by the overwhelming weight of authority that it is
reversible error to give them after the adjournment of court in
the absence and without the knowledge of the parties or their
counsel: McNeil v. State, 47 Ala. 498 ; Collins v. State, 33 Ala.
434 ; Wade v. State, 12 Ga. 25 ; Fisher v. People, 23 Ill. 283 ;
Crabtree v. Hagenbaugh, 23 Ill. 349 ; Fish v. Smith, 12 Ind.
563 ; O'Connor v. Guthrie, 11 Iowa, 80 ; Sargent v. Roberts, 18
Mass. 337 ; Merrill v. Nary, 92 Mass. 416 ; Read v. Cambridge,
124 Mass. 567 ; Benson v. Clark, 1 Cow. 258 ; Moody v. Pome-
roy, 4 Den. 115 ; Taylor v. Betaford, 13 Johns. 487; Bank v.
Mix, 51 N. Y. 558 ; People v. Maurer, 43 N. Y. 1 ; Hoberg v.
State, 3 Minn. 262 ; Kirk v. State, 14 Ohio, 511 ; State v. Pat-
terson, 45 Vt. 308.

· " Against this weight of authority " (quoting from the opin-
ion of Mr. Justice GRAY in Read v. Cambridge, supra), " the
only cases brought to our notice which countenance a different
rule are two in New Hampshire and one in S. Carolina.   And
in the latter the point adjudged related only to instructions as
to the form of the verdict given by the judge to the foreman in
open court; and the criticism upon the judgment of this court

in Sargent v. Roberts, (18 Mass. 337,) was based upon the singular theory that the intercourse between the jury and the bench is so confidential that often communications from the jury ought not to be disclosed to the bar." The New Hampshire decisions called to our attention relate only to the practice in civil cases and do not discuss the right of the accused in criminal prosecutions. Moreover, if additional instructions are given during the recess the precaution is taken to put them in writing, and to require the jury to return them with their verdict; so that no question can ever arise as to what the instructions were. In Meece v. Com., 78 Ky. 586, the additional instructions were given in open court; they were beneficial to the defendant; and his counsel was present. In Davis v. State, 14 Ind. 358, the defendant had notice that the court would meet at the ringing of the bell to receive the verdict. All that was decided in State v. Pike, 65 Me. 111 was, that "there is no rule of law requiring the court to send for counsel who choose to absent themselves while their cases are being considered by the jury." To the same effect is Com. v. Kelley, 165 Mass. 175. "In contemplation of law the parties and their counsel remain in court until a verdict has been rendered, or the jury discharged from rendering one:" Cooper v. Morris, 48 N. J. L. 607. Let this be granted; but surely it cannot be contended, that it is their duty to remain in the court room, after the court has been regularly adjourned for the day. None of these cases sustain the contention of the commonwealth in the present case.

The assignment of error under consideration is not based on a "mere technical nicety," but raises a question of substantial right, as well as a question of practice of the highest importance in the administration of criminal justice. If one instruction may be given in the absence of the accused and without his knowledge, there is no good reason why the whole of the instructions may not be given in his absence and without his knowledge. So also, if, after the regular adjournment of the court, in the absence, and without the knowledge, of the accused, or of his counsel, the trial judge may call the jury into the court room and there instruct them as to the law of the case, and as to the bearing of the evidence, we see no reason why he may not call them to his chambers, or go to their room for the same purpose. Conceding that the convenience of

jurors would sometimes be subserved if the trial judge had such power, and also that the power would be lodged in hands highly responsible for the exercise of it, nevertheless, it would be liable to abuse.  It is better that jurors, in exceptional cases, suffer some slight inconvenience than that countenance be given to a practice, which, followed to its logical results, would destroy one of the safeguards of the accused, which reason and experience combine to show is of the highest value.  It has been well said of another constitutional guaranty and may be said as appropriately here : " It is the capability of abuse and not the probability of it, which is regarded in judging of the reasons which lie at the foundation, and guide in the interpretation of constitutional restrictions : " Emery's Case, 107 Mass. 172. " There is no more sacred duty of a court than, in a case properly before .it, to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman ; and in such cases no narrow or illiberal construction should be given to the words of the fundamental law in which they are embodied : " Mr. Justice MILLER in Ex parte Lange, 85 U. S. 163.

We do not think we have overestimated the importance of the question ; for we are firmly convinced that to hold the error complained of to be harmless would be, virtually, to deny the right of the accused to be present at an important part of his trial, and would establish a dangerous precedent, contrary to the just and humane principles of the fundamental law, and inconsistent with orderly procedure, and long established usage as shown by the adjudged cases.  It is better that this case should be tried a third time than that such a precedent should be established.

The judgment is reversed and a venire facias de novo awarded.