## Commonwealth v. Cox.

*Criminal law—Driving automobile while intoxicated—Evidence—Witness against self—Physical examination—Medical expert—Constitutional law.*

1. Where a person charged with driving an automobile while under the influence of intoxicating liquor voluntarily submits himself to a physical examination by a medical expert, such expert, after subjecting the defendant to the usual tests, may testify that in his opinion the defendant was under the influence of intoxicating liquors at the time of his arrest.

2. Such testimony does not contravene the ninth section of the first article of the Constitution which provides that "in all criminal prosecutions the accused cannot be compelled to give evidence against himself."

3. The constitutional provision only protects a person from any disclosure sought by legal process against him as a witness, but does not include his body as evidence when that is material.

4. The constitutional provision is a limitation only upon the action of an officer of the State, or some person acting by authority of a State officer and under his direction, or of a person acting under color of authority from the Commonwealth.

5. It does not apply to the action of a private individual, although a practicing physician, or a petty officer like a township constable proceeding without, above and beyond State authority and possessed of no color of State right.

6. The constitutional provision may be waived by consent of the person accused, express or implied.

7. Where an accused voluntarily submits to a physical examination by a medical expert, he waives his constitutional right and cannot object at his trial to the testimony of the expert based on the examination to the effect that the accused was under the influence of liquor at the time of the examination.

Motion of defendant in arrest of judgment and for new trial. Q. S. Montgomery Co., Nov. Sess., 1926, No. 26.

*George C. Corson,* Assistant District Attorney, for Commonwealth.

*Francis J. Walsh* and *Albert J. Taylor,* for defendant.

## Commonwealth v. Cox.

WILLIAMS, P. J., Oct. 28, 1927.—Jesse Cox, the defendant, having appealed from the order of the first day of last July overruling his motion in arrest of judgment and for a new trial, dismissing all the reasons supporting the motion, refusing a new trial and denying an arrest of judgment—the reasons for which order do not appear of record—and from the judgment of sentence on the twenty-third day of last month imposed upon him, the court herein files of record, in compliance with Rule Fifty-eight (58) of the Superior Court, at least a brief statement of the reasons for such order in the form of an

### Opinion.

Immediately after sensible conviction by a jury of the defendant for a violation of that part of the second paragraph of the twenty-third section of the Act of June 30, 1919, P. L. 678-701, 692, which says that "No person shall operate a motor vehicle while under the influence of intoxicating liquor," he moved, by his counsel and in writing, both for a new trial and in arrest of judgment because, first, the verdict had been against the law; second, against the evidence; and, third, the court had erred in admitting the testimony of Dr. Fine. Although the trial judge, in entertaining the motion and ordering it on the next argument list—where, in due course, the motion was heard by the court in banc—and in directing the transcription and filing of the notes of testimony and the charge, had granted the defendant leave, within Ten (10) days after such transcription and filing, to assign additional written reasons in support of the motion, no new reason was ever so assigned. To the contrary, at the argument, the first and second reasons were practically abandoned by the defendant's counsel, who pressed only the third reason.

At the trial, Dr. Walter E. Fine, a graduate of the Hahnemann Medical College, of the city and county of Philadelphia, and, ever since 1904, a continuous practitioner of medicine in the borough of Ambler, this county, testified, on behalf of the Commonwealth, that, between Seven (7 P. M.) and Eight (8 P. M.) o'clock in the evening of Sunday, the seventeenth day of October, 1926, John T. Camburn, constable of the township of Whitpain, this county, had brought the defendant to the office of the witness; that, then and there, he had seen the defendant walk with unsteady gait, had detected the odor of alcohol upon his breath and had heard him so incoherently speak and mumble his words that, at times, the physician could hardly understand the defendant; that the doctor had submitted to the defendant, first, the test of standing up with eyes closed and hands and toes together, whereupon the defendant swayed; second, the ocular test and thereby found the mucous membranes covering the outer surfaces of the eye-balls and the inner surfaces of the eye-lids of the defendant much inflamed; and, third, the test of closing his eyes and bringing the index finger of his right hand to his nose, to which test the defendant reacted with such great negation that not only did he usually miss his nose but often he could not find even his cheek; that, in consequence of the observation of the defendant by the physician and his conversation with the former and as a result of the tests, the witness felt himself qualified to express an opinion as to whether the defendant had or had not been under the influence of intoxicating liquor; and that, at the time of the examination of the defendant, he had been under such influence.

On cross-examination, Dr. Fine swore, also, that when the defendant had come to the office of the witness, he knew the defendant was under arrest; that the physician had not told the defendant anything he might say or do could later be used against him; and that, without the tests, the doctor would not have been able to say the defendant had been under the influence of

intoxicating liquor: wherefore, it is contended by counsel for the defendant that all of the testimony of Dr. Fine should have been excluded from consideration by the jury on the ground that, at the time of the examination, the witness having failed to inform the defendant whatever he should do might be employed adversely against him at subsequent trial, the constitutional privilege of the defendant had been violated in that he was compelled to be a witness against himself. In other words, the sole contention of the defendant is that the admission of the evidence of Dr. Fine was in derogation of that part of the ninth section of the first article of the Constitution of our Commonwealth which provides that "In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself," the manifest purpose of which provision, in conferring upon every citizen the personal privilege of remaining silent whenever it appears reasonable his testimony or declaration might result in self-incrimination, Commonwealth *v.* Bolger, Appellant, 42 Pa. Superior Ct. 115, 121, was to prohibit the compelling of self-incriminating testimony. In Re Adjudication of Contempt of Myers and Brei, 83 Pa. Superior Ct. 383, 388.

At once it is to be noted that what is prohibited by the constitutional clause under discussion is the *compelling* of an accused to give evidence against himself, that the object of the so-called right organically declared is to secure for the defendant freedom from *compulsion* of disclosure of self-incriminatory testimony, that the personal privilege recognized by fundamental law is a protection to one charged with the commission of crime only in that he cannot be *"compelled"* to incriminate himself.

To compel—as is signified by the Latin derivation, *compellere,* from *con,* together, and *pellere,* to drive, *i. e.,* to drive together—is to urge with irresistible force; and, hence, is to oblige, to necessitate, to constrain, to coerce, to subdue, to force, to yield; or to exact, to extort, to seize, to wrest, to take by violence; or to overcome, to overpower, to subjugate.

Compel is synonymous with force. To force is to constrain, to do by the exercise of an overwhelming power, as soldiers are forced to submit to their conquerors, or slaves are forced to labor by their masters; to do violence to, as females are forced in common law rape; to get, impel or obtain by main strength; to take by struggle; to capture by assault; to storm; to strain; to exert to the utmost; to produce by excessive, unnatural or untimely pressure or action.

Compulsion, instantly suggestive of might in opposition to impotence and of obligation as opposed to volition, means forcible inducement to the commission of an act and involves the setting in motion of power and the actual application of strength by one followed by the doing of an act requiring fulfillment and affording no alternative by another, who acts contrary to his will.

In the instant case, the record fails to show, even out of the mouth of him who had the greatest interest in the result of the trial, that the defendant was urged with irresistible force to accompany the township constable to the office of Dr. Fine, or that, there, the defendant was forced to walk, or was obliged to talk to the physician or answer his questions, or was coerced into closing his eyes, or into placing the tips of his fingers upon the ends of his toes, or into allowing the doctor to see the hot and irritated conjunctiva, or into attempting to swing the right index finger toward the organ of smell. There is no evidence of constraint or necessitation on the part of the defendant; no testimony that he was violently impelled to speak or take the tests applied by Dr. Fine; nothing to show that either the words or acts of the

defendant were exacted, extorted or wrested from him after he had been overcome, overpowered or reduced to a state of subjugation. In short, there was no forcible inducement to the utterance of any word spoken or to the commission of any act done by the defendant in the office of the physician. On the other hand, so far as the record discloses, every word spoken and every movement made by the defendant in the office of the doctor was a voluntary utterance and a free-will act said and done without the preceding application of violence to and without the requirement of fulfillment by the defendant at a time when he was afforded full alternative of silence and inaction.

Since, then, the examination by Dr. Fine of the defendant was not against his consent but, quite to the opposite, he took the tests voluntarily and, in his own defense at trial, related what had transpired at the giving of the examination without once intimating or suggesting anything said or done there by him was against his volition, Commonwealth v. Gressley, 12 Lehigh County Law Journal, 169, 170, 9 D. & C. 803, and since, therefore, the defendant was not *compelled* to give evidence against himself, the order of July 1 was entered and the sentence of September 23 was imposed.

Had an appeal not been taken, this opinion might well rest here, but, inasmuch as the case is to be reviewed, further discussion may not be out of place.

In the seventeenth century, the English courts adopted, as a rule of evidence, the Latin maxim *"Nemo tenetur seipsum accusare,"* 8 R. C. L. 77, the underlying principle of which has been adopted as the fundamental law of the land, Note, 59 L. R. A. 465, for the Constitution of the United States declares that no person shall be compelled in any criminal case to be a witness against himself, Boyd v. United States, 116 U. S. 616. It is well to remember, however, that such immunity does not exist in Pennsylvania by virtue of any part of the Federal Constitution, Twining v. State New Jersey, 211 U. S. 78, and that the quasi right,—born as it was in abhorrence to confessions wrung by inquisitorial torture a thousand times more terrible than the punishment for the crime confessed, Cooper v. State, 6 So. 110,—while not merely a formal technical rule enforceable or unenforceable at the discretion of the court but a mandatory, constitutional provision securing something substantial and of value to every defendant, Gillespie v. State, 115 Pac. 620, is, after all, nothing more than a statement in form of organic law of the common law rule of evidence and guarantees no greater privilege than that in every criminal case the accused shall be free from *compulsion* by legal process to give self-incriminating *testimony*, State v. Fuller, 85 Pac. 369.

"Looking back at the history of the privilege and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to . . . extract from the person's own lips an admission of his guilt, which will take the place of other evidence. Such was the process of the ecclesiastical Court, as opposed through two centuries,—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath.

"Such, too, is the inference from the policy of the privilege as a defensible institution; . . . that is to say, it exists mainly in order to stimulate the prosecution to a full and fair search for evidence procurable by their own exertions, and to deter them from a lazy and pernicious reliance upon the accused's confessions.

"Such, finally, is the practical requirement that follows from the necessity of recognizing other unquestioned methods of procuring evidence; for if the privilege extended beyond these limits, and protected an accused otherwise than in his strictly testimonial status,—if, in other words, it created inviolability not only for his physical control of his own vocal utterances, but also for his physical control in whatever form exercised, then it would be possible for a guilty person to shut himself up in his house, with all the tools and *indicia* of his crime, and defy the authority of the law to employ in evidence anything that might be obtained by forcibly overthrowing his possession and compelling the surrender of the evidential articles,—a clear '*reductio ad absurdum.*'

"In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.* The one idea is as essential as the other.

"The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure *sought by legal process against him as a witness.*" Wigmore on Evidence, Second Edition, Volume 4, Section 2263, pages 863-4.

The object of the constitutional provision was to prohibit the compulsory oral examination of prisoners before and upon trial for the purpose of extorting unwilling confessions or declarations implicating them in crime. The provision can reach farther only in exceptional and peculiar cases coming well within the purpose of the inhibition. A murderer may be taken by force before his dying victim for identification and then, upon trial, the dying declaration of the victim may be proven for the identification of the defendant; a thief may be examined forcibly and the stolen property may be taken from his person and brought into court for his condemnation; the person of a prisoner may be examined against his will for marks and bruises and then, upon trial, they may be proven to establish his guilt; and it would be stretching the constitutional inhibition too far to make it cover such cases and the inhibition thus applied would greatly embarrass the administration of justice. People *v.* Gardner, 144 N. Y. 119, 128.

Not only then was the defendant not *compelled* to give evidence against himself but what, if anything, he gave against himself was not *evidence* within the meaning of Section 9, *supra.*

"If an accused person were to refuse to be removed from the jail to the court room for trial, claiming that he was privileged not to expose his features to the witnesses for identification, it is not difficult to conceive the judicial reception which would be given to such a claim. And yet no less a claim is the logical consequence of the argument that has been frequently offered and occasionally sanctioned in applying the privilege to proof of the bodily features of the accused.

"The limit of the privilege is a plain one. From the general principle . . . it results that an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, *i. e.*, upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action — as when he is required to take off his shoes or roll up his sleeve—is immaterial—unless all bodily action were synonymous with testimonial utterance; for, as already observed, not compulsion alone is the component idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself. Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be

placed as involving his consciousness of the facts and the operation of his mind in expressing it, the demand made upon him is not a testimonial one. Moreover, the main object of the privilege . . . is to force prosecuting officers to go out and search and obtain all the extrinsic available evidence as an offense, without relying upon the accused's admissions. Now in the case of the person's body, its marks and traits, itself is the main evidence; there is ordinarily no other or better evidence available for the prosecutor. Hence, the main reason for the privilege loses its force.

"Both principle and practical good sense forbid any larger interpretation of the privilege in this application; and healthy judicial opinion has frequently pointed this out:" Wigmore On Evidence, *supra*, Section 2265, pages 873-4.

Evidence is either real or personal. There is no such thing as mixed evidence. By real evidence is meant all evidence of which any object belonging to the class of things is the source; persons also being included in respect of such properties as belong to them in common with things. What we term real evidence, the civilians called *"evidentia rei vel facti."* This sort of evidence may be either immediate, where the thing comes under the cognizance of our senses; or reported, where its existence is related to us by others. Personal evidence is that which is afforded by a human agent; either in the way of discourse or by voluntary signs. Evidence supplied by observation of involuntary changes of countenance and deportment comes under the head of real evidence. Best on Evidence, Vol. 1, Section 28, pages 26-7, and Section 196, page 307.

Instances of real evidence leading to the detection of offenders are familiar to all concerned in the practical administration of justice. In the case of a burglary, the thief had gained admittance to the house by opening a window through means of a penknife, which was broken in the attempt and part was left in the wooden frame: the broken knife was found in the pocket of the prisoner and corresponded perfectly with the fragment left. A murder had been committed by shooting the deceased with a pistol and the prisoner was connected with the transaction by proof that the wadding of the pistol was part of a letter belonging to the prisoner, the remainder of which was found upon his person. In the case of robbery, it appeared the prosecutor, when attacked, had, in his defence, struck the robber with a key upon the face and the prisoner bore an impression upon his cheek which corresponded with the wards of the key. Starkie On Evidence, Fourth Edition, pages 844-5, and Ninth Edition, pages 744-5.

"If an officer who arrests one charged with an offense had no right to make the prisoner show the contents of his pocket, how could the broken knife, or the fragment of paper corresponding with the wadding, have been found? If when a prisoner is arrested for passing counterfeit money, the contents of his pockets are sacred from search, how can it ever appear whether or not he has on his person a large number of similar bills, which, if proved, is certainly evidence of the *scienter?* If an officer sees a pistol projecting from the pocket of a prisoner arrested for a fresh murder, may he not take out the pistol against the prisoner's consent, to see whether it appears to have been recently discharged? Suppose it be a question as to the identity of the prisoner, whether a person whom a witness says he saw commit a murder, and the prisoner appears in court with a veil or a mask over his face. May not the Court order its removal in order that the witness may say whether or not he was the person whom he saw commit the crime?

"Would the robber whose face was marked with the wards of a key have been allowed to conceal his identity by wearing a mask during his trial?" State v. Graham, 74 N. C. 646, 648-9, or 492, 494-5, 1906, reprint.

Real evidence is always admissible, even though secured from the defendant by compulsion. The object of all evidence is to elicit the truth. Involuntary confessions, made either under the fear of punishment if not made or in the hope of escaping from punishment if made, are not receivable as evidence, because experience has demonstrated they are liable to be influenced by these motives, and, hence, cannot be followed as guides to truth. This objection, however, does not apply to real evidence. Neither the fear nor the hope of the defendant could have produced his state of body found by Dr. Fine. Therefore, the physical condition of the defendant was a fact calculated to aid the jury and fit for their consideration. State v. Graham, supra, 647, or 493.

It is apparent, then, although ordinarily by evidence is meant anything which tends to prove or disprove any matter in question, or to influence the belief respecting such matter, although the word evidence, in legal acceptation, includes all the means by which any alleged matter of fact, the truth of which is submitted to investigation, is established or disproved and although testimony is not synonymous with evidence, the latter being the more comprehensive term and including all that may be submitted to the jury, whether the statements of witnesses, the contents of papers, documents or records, or the inspection of whatever the jury may be permitted to examine and consider during the trial, that, nevertheless, in Section 9, supra, the makers of the Constitution used the word evidence in the restricted sense of testimony and did not intend by the employment of the more comprehensive term to include real evidence. Particularly is one forced to this conclusion if it be kept clearly in mind that in the interpretation of the general principle under discussion nothing turns upon the variations of wording in the Forty-six (46) state constitutional clauses, In re Adjudication of Contempt of Myers and Brei, supra; that constitutional sanction, being not the creation of a new privilege but simply the recognition of an old one, has not altered the tenor and scope of the privilege but merely given greater permanence to the traditional rule of evidence bequeathed us; that the members of the constitutional conventions did not intend to codify the various details or in any respect alter the known bearings of the rule but solely to describe the rule sufficiently to lead to prompt identification as a principle; that plain proof of this intention is to be found in the extreme brevity of the clauses naming the privilege and strong-corroboration of the purpose is to be discovered in the undoubted uniformity of purpose running through all constitutional efforts; and that, therefore, it is immaterial the accused is protected in Pennsylvania from giving evidence—while in other states only from testifying, being a witness, etc.,—against himself, since, after all, the various phrasings of the privilege spring from a common conception of the form of the protected disclosure. Wigmore on Evidence, supra, Section 2263, page 863, and Section 2252, page 831.

But, even if we are wrong in our conclusions, first, that no compulsion was exerted upon the defendant and, second, that the constitutional privilege sought to be invoked for his aid covers only statements made by him in court under process as a witness, there is still another reason why there was no error in the admission of the testimony of Dr. Fine.

The object of Section 9, supra, having been merely the restraint of arbitrary power and the prevention of despotic action on the part of state sover-

eignty, or persons acting under the authority of the Commonwealth, or, at the utmost, under color of state authority, the section itself is a limitation only upon the action of an officer of the state, or of some person acting by authority of a state officer and under his direction, or of a person acting under color of authority from the Commonwealth, and not upon the action of a private individual, although a practicing physician, or a petty officer like a township constable, proceeding without, above and beyond state authority and possessed of no color of state right. Commonwealth v. Albert Johnson, 41 Montg. Co. L. R. 283, 7 D. & C. 435, and the authorities therein cited, 291-2. In other words, the chief, if not the only, design of the inhibition against the testimonial compulsion contained in the Ninth Section of the Declaration of Rights of the Constitution was to fix a barrier against possible tyranny and despotism on the part of the state government; that is, what the framers of the Constitution of 1874 and of prior organic laws of the Commonwealth endeavored to forestall was merely the successful culmination of a possible movement to make the state government more powerful through the abrogation of the ancient rule of evidence. The intent of the makers of the fundamental state law was that the constitutional restriction against compelling the accused to give evidence against himself should so confine the legislative branch of the Commonwealth as to render ineffectual any future attempt to make lawful by act of assembly the testimonial compulsion of an accused which the people, speaking through their delegates in constitutional convention assembled, had ordained could in no event become lawful; should so operate upon the executive branch as to preclude any likelihood of the enforcement of a statute in violation of the constitutional inhibition, even if such a law were ever to be enacted by the legislature; and should so press upon the judicial arm of the government as to cause the courts promptly to tear the mask from the face of every testimonial compulsion parading in the guise of express legislative sanction. So far, but no farther, may the judicial hand of the Commonwealth reach. Commonwealth v. Julius Johnson, 41 Montgomery County L. R. 305, 306.

It must not be forgotten that the function of fundamental law ends with the creation, expression and declaration of constitutional rights. To the legislative branch of government is confined the power, and upon that department alone devolves the duty, of framing the legislation necessary and best adapted to afford the citizen protection in the enjoyment of the rights guaranteed him by organic law. In the exercise of such power and the performance of such duty, the Legislature of Pennsylvania has declared that, "Except defendants actually upon trial in a criminal court, any competent witness may be compelled to testify in any proceeding, civil or criminal; but he may not be compelled to answer any question which, in the opinion of the trial judge, would tend to criminate him." Act of May 23, 1887, P. L. 158, Section 10,161. To the executive and judicial branches of government is assigned only the faithful enforcement of the laws provided by the legislature in carrying out constitutional provisions and with such enforcement the responsibility of the court ceases. Therefore, inasmuch as no law in this Commonwealth forbids the medical examination of an accused in a criminal prosecution, the admission of the testimony of Dr. Fine was not error. Commonwealth v. Julius Johnson, supra, 307.

In the fourth place, conceding for argument, but not in fact or reason, that everything heretofore said has been untrue or fallacious, granting that Dr. Fine compelled the defendant to take the tests, that the medical examination constituted evidence and that the physician was a state officer, the testimony

of the doctor should not have been excluded because the defendant failed to claim his constitutional privilege,—at most an option on his part to refuse to undergo the tests and not a prohibition on the part of Dr. Fine to make an examination.

The provision guaranteed by the quoted clause of Section 9, *supra*, may be waived by consent, express or implied. Otherwise, a defendant offering himself as a witness in his own behalf could not be subjected to a cross-examination bringing out criminating facts if he should conclude not to submit to such an examination. And yet, it is settled beyond all dispute that, when the accused thus offers himself, he waives his privilege as to every involved issue. So, while a defendant cannot be compelled to give evidence against himself, if voluntarily he gives such evidence, he cannot object to the use of the evidence against him. So far as that evidence is concerned, his constitutional privilege is waived. Commonwealth v. Doughty, 139 Pa. 383, 397-8; Commonwealth v. House, 6 Pa. Superior Ct. 92, 104; Commonwealth v. Exler, Appellant, 61 Pa. Superior Ct. 423, 426-7, 437; Commonwealth v. O'Malley, Appellant, 81 Pa. Superior Ct. 100, 102-3; and Thompson v. United States, 10 F. (2nd) 781, 784, and many authorities collected in the foot-note to the last case. Although Dr. Fine requested the defendant to go through certain physical movements, without objecting the latter acceded promptly to the request. The right of objection having been thus waived by the defendant, who took the chances of the examination resulting favorably to himself, it would be contrary to every rule of practice to permit him to take advantage of what was done by the physician, even if he had no right to submit the tests. Johnson v. The Commonwealth, 115 Pa. 369, 373, 395.

At the argument on the motion, counsel for the defendant suggested rather naively and, later, by written brief stated still more ingenuously that he laid "particular emphasis on" "the fact that all the evidence indicated that" "at the time of the examination" his client "was under the influence of liquor" "and, therefore," "with a full knowledge of" the "meaning" of "an examination" "could not have given his consent." The answer is, of course, that, at the trial, the defendant himself admitted the operation of a motor-vehicle at the time and place charged by the Commonwealth and, if his counsel now concedes that, at such time and place, his client was under the influence of intoxicating liquor, surely the jury made no mistake in finding the defendant guilty. Moreover, any man who drives an automobile on Sunday along a main highway of this state while he is so drunk as not to know the difference between an examination by a physician and a gymnastic drill by a physical culturist is entirely too drunk for public safety and altogether too dangerous a menace to travelers to be allowed the freedom of gasoline locomotion.

The prohibition of compelling the accused in a criminal prosecution to give evidence against himself is a prohibition against the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when such body is material. In principle, the objection of the defendant would forbid a jury to look at a prisoner and compare his features with a photograph in proof. Holt v. United States, 218 U. S. 245, 252-3; Perlman v. United States, 247 U. S. 7, 15; Schenck v. United States, 249 U. S. 47, 50; and Commonwealth v. Randolph, Appellant, 74 Pa. Superior Ct. 76, 77-8.

To hold that the examination of Dr. Fine was a violation of the mooted clause in Section 9, *supra*, would be a strained construction of the Constitution. If such construction were adopted, as pointed out by Professor Wigmore, there would be nothing to prevent a person accused of having stolen

property in his possession from successfully interposing a like plea of constitutional immunity and, thus, thwarting every attempt to find and recover the purloined loot. While the constitutional rights of defendants in criminal prosecutions should never be violated, at the same time care must be taken not to deprive the Commonwealth of all legitimate means for the detection of crime and the punishment of criminals: Commonwealth *v.* Valeroso, Appellant, 273 Pa. 213, 221.

NOTE.—This case was appealed and the appeal subsequently discontinued.

From Aaron S. Swartz, Jr., Norristown, Pa.