738 A.2d 406

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**David CHMIEL, Appellant.**

Supreme Court of Pennsylvania.

Argued April 27, 1998.

Decided Aug. 19, 1999.

482

Gerard E. Grealish, Scranton, for D. Chmiel.

Ronald T. Williamson, Norristown, for Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

Among the numerous issues raised in this appeal is the following: Did the trial court err in allowing the Common-

wealth to introduce into the record of Appellant David Chmiel's second trial portions of the testimony given at an ineffectiveness hearing by Thomas Kennedy, Esq. (now deceased), counsel for Chmiel at his first trial? We conclude that the admission of such testimony was error and therefore reverse.

## I. Background

David Chmiel was charged with stabbing to death three elderly siblings, Angelina, Victor, and James Lunario, while robbing their home in Throop, Lackawanna County, in the early morning hours of September 21, 1983. In 1984, a jury convicted Chmiel of three counts of murder in the first degree and sentenced him to death. This Court reversed the convictions after finding that trial counsel (Attorney Kennedy) had been ineffective. *Commonwealth v. Chmiel,* 536 Pa. 244, 639 A.2d 9 (1994). Chmiel was retried in 1995. As before, he was convicted of three counts of first degree murder and sentenced to death. This direct appeal from that judgment of sentence followed.

The principal Commonwealth witness against David Chmiel at both the first and second trials was his brother, Martin Chmiel. According to Martin, David told him late in the summer of 1983 that he needed to obtain money quickly; he (Martin) told David that the Lunarios kept large sums of money in their home; and he and David then decided to break into the Lunarios' home in order to steal the money. While admitting that he participated in the planning of the break-in to the extent of fashioning ski masks for himself and David from the sleeves of an old sweater, Martin asserted that he subsequently changed his mind and had nothing further to do with the scheme. Martin testified that David confessed to him shortly after the murders that he had stabbed the Lunarios to death and stolen $5,300.00 from their home.

After the jury's verdict in the first trial, David Chmiel filed counseled post-trial motions as well as a *pro se* petition alleging that Attorney Kennedy had been ineffective for, *inter alia,* making no effort to locate alibi witnesses, discouraging

him from taking the stand, and failing to request an accomplice instruction as to Martin Chmiel's testimony. The trial court appointed new counsel, stayed the post-trial motions, and held an evidentiary hearing (treated as a hearing pursuant to the then-effective Post Conviction Hearing Act, 42 Pa.C.S. §§ 9541–9551) on the ineffectiveness claims. Following the hearing, at which Attorney Kennedy testified, the trial court denied David Chmiel's post-trial motions and formally imposed the sentence of death.

On direct appeal, this Court determined that Attorney Kennedy's failure to request an accomplice instruction with regard to the testimony of Martin Chmiel constituted ineffective assistance that prejudiced the defendant. Accordingly, the judgment of sentence was reversed and the case remanded for a new trial.

Prior to the retrial, David Chmiel (hereinafter "Chmiel") filed an omnibus motion requesting, *inter alia*, that the trial court preclude the use at trial of the testimony given by Attorney Kennedy at the evidentiary hearing in 1988.[1] The basis for the motion was that such testimony had impermissibly disclosed confidential attorney-client communications. Opposing the motion, the Commonwealth argued that Attorney Kennedy's testimony should be admitted for impeachment purposes in the event that Chmiel decided to take the stand. The trial court denied Chmiel's motion to preclude use of the testimony.

Although he did not testify at his first trial, Chmiel chose to do so at his second. The crux of his testimony was that circumstances at the time of the killings strongly suggested to him that his brother Martin had committed the crime. Chmiel testified on direct examination that he had gone near the Lunarios' residence on only two occasions. The first occasion was in late June or early July of 1983, when he and Martin went there to "case the joint." The second occasion was early in September of that year, when he and Martin drove to the

---

1. This was a motion *in limine*, although not styled as such. *See generally Commonwealth v. Bazemore*, 531 Pa. 582, 584, 614 A.2d 684, 685 (1992).

residence with the intent of burglarizing it; however, they abandoned the plan upon discovering that, contrary to their expectation, someone was at home.

Concerning his whereabouts on the night of the murders, Chmiel testified as follows: After having spent the day doing construction work on the home of Nancy and Tom Buffton, his sister and brother-in-law, Chmiel arrived home at about 4:30 p.m. Leaving there, he drove to the residence of Mike Cordaro, an electrical contractor to whom he owed money, in order to pay him. After paying Cordaro, Chmiel drove to North End Plumbing Supply to check prices, to a six-pack store to buy lottery tickets, and then to Betz's Bar, where he stayed until at least 11:00 p.m. From the bar he went to the Bufftons' house to check on tools that had been left there; to the home of a friend, Pat Battle, with whom he had a few beers; and to his brother Marty's house, where he learned from Marty's wife that Marty was not at home but was with Tom Buffton. After stopping at a donut shop and a mini-market, Chmiel went home. He went out once more to buy aspirin for his child. Then, he testified, he returned home to stay at 3:00 or 3:15 a.m.

As promised, the Commonwealth used Attorney Kennedy's testimony to cross-examine Chmiel concerning his whereabouts at the time of the murders. Because it is important to understand the nature of such testimony and the use that was made of it, we quote at length the pertinent portion of the cross-examination.

Chmiel maintained that he had not been in the vicinity of the Lunario residence when the murders were committed and that he had "never ... told anybody anything different...." The prosecutor then asked:

Q: Well, isn't it a fact, though, sir, for a period of five months starting with a conference with Mr. Kennedy on October the 5 th that you maintained that you were on the scene at 1:00 o'clock in the morning and you tried to blame your brother because you said your brother was running from the scene?

A: Yes.

Chmiel's positive answer to the prosecutor's question was apparently a mis-statement on his part, because immediately thereafter he asserted that he had gone to the Lunario residence only on the two occasions mentioned earlier. Cross-examination continued as follows:

Q: Now tell me this, sir: Why for five months did you lie to Mr. Kennedy and say that you were on the scene of the crime at 1:00 o'clock in the morning on the 21st of September, that you saw Marty running out and you were going to blame Marty. And you said, Hey, Marty, and he got in the Toyota and drove away. Why did you lie to Mr. Kennedy and give that phony story?

A: I did not lie to Mr. Kennedy. I never told him that.

. . .

Q: At [the evidentiary hearing] did you hear Mr. Kennedy testify as follows... . He's talking about different versions that you gave him. Do you remember him saying that you gave him three different versions of what happened? Do you remember him saying that?

A: Yes, I remember him saying that.

Q: Do you remember him saying, "The first version [given by Chmiel] of what had happened ... on the night of September the 21st ....included an admission by him that he was at the scene of the murder not for the purpose of robbing or killing but was there to case the joint. At that time the notes indicate that he saw a shadow, that he perceived it to be, at least he thought it to be his brother Marty, and that he called out, 'Marty', that the shadow ran down an alley of the Lunario house which he was casing, got into ... a car that Dave said he thought belonged to Tom Buffton. And [he gave] a description, I think it was a Toyota, a brown Toyota owned by Thomas Buffton." ... Now do you recall Mr. Kennedy testifying that way under oath?

A: Yes, sir, I do.

Q: He said that, didn't he?

A: Yes, sir, he said that at a hearing that I was questioning his ineffectiveness.

Q: So he lied is what you're saying?

A: I'm saying—I can't say he's lying. I'm saying I did not tell him that.

Q: In other words he just made this up?

A: Well, I don't know what he did. It's not what I told him.

Q: It's not what you told him; he just made it up. Isn't it a fact, sir, that he testified that you said to him ... he was ineffective because you wanted to testify to certain things and he said, he advised you not to go along with it because he did not want to be a party to perjury since you had given him three different stories. Do you remember him testifying that way?

A: He did say that at the ineffectiveness hearing, yes.

. . .

Q: He said that he didn't want you to get up and lie and he would not be a part of it?

A: He said that was one of the reasons he did not put me on the stand, that's right.

. . .

Q: And didn't he say, also, that you maintained that position for five months, isn't that what he said?

A: He may have said that; that's probably what he said. I don't recall if he said five months, but he did say there was another version given later or something like that.

Q: There were two other versions given?

A: Yes, I think he said three.

Q: Three. As a matter of fact the version ... that you testified to yesterday is Version No. 2?

A: No, that's version [sic] from the very beginning; that's version No. 1.

Q: According to Mr. Kennedy's sworn testimony, what you had given him is Version No. 2?

. . .

A: Yes. That was at a hearing where I was questioning his effectiveness and his professionalism, and that's what he said, yes.

Q: Well, you were questioning his professionalism because he advised you not to get up on the stand and lie because you told him three different stories. That's what he said, right?

A: That's what he said—

Q: You wanted to get up on the stand and lie and he didn't want you to do that?

. . .

A: That's what Mr. Kennedy said, but that's not, that is not what I told him. I maintained from the very beginning, before the preliminary hearing to the bail hearing to the, every hearing I went to, right from the beginning, that the story I told yesterday, the version I gave yesterday, was the truth from the very beginning.

Q: So in other words this is just a pure fabrication? This is something that Mr. Kennedy dreamed up out of his imagination that you were there at 1:00 o'clock in the morning on the scene . . . ?

A: I know I did not tell him that.

Q: Okay. Do you recall him saying this. . . . And he's talking about a conversation that he had with you where he's questioning you. . . . ["]Now tell me where you were at that period of time. . . ." This is Mr. Kennedy testifying. "We started at, I think I asked him to start at 8:00 o'clock in the morning, and minute by minute he told me where he was . . . the whole day until . . . [he] ends up in front of the Lunario house at or around the time the murders were being committed. I said, 'Oh, my God, how do we handle this?' "

"That was changed a couple months later. He suddenly remembered he was elsewhere, and I've got to play the game, you know, I've got to get out there and structure an alibi with a witness who keeps changing. It's kind of a tough assignment." Do you remember Mr. Kennedy testifying that way?

A: Yes, vaguely I do, yes.

. . .

Q: So [Mr. Kennedy] swore unequivocally that you told him for a period of months that you were on the murder scene, isn't that right?

A: That's what he said at that hearing, yes.

Q: And not only that, but you were trying to blame your brother Marty, isn't that right?

A: That's not true.

Q: You were trying to blame your brother Marty by saying, I was there but I was just casing the place and Marty ran away and Marty got into this Toyota, Buffton's Toyota. So you were trying to put the blame on Marty.

A: No, sir.

Q: It was a lie, wasn't it?

A: No, sir, it was not a lie.

Q: All three stories were lies, Story No. 1, Story No. 2, and Story No. 3 are all lies?

A: There's only one story.

Q: You told story No. 2 according to Mr. Kennedy?

A: Yes, according to Mr. Kennedy—

. . .

Q: Now, do you recall that Mr. Kennedy said it wasn't until February the 11th of 1984 that you suddenly said, . . . Whoops, I made a mistake. I wasn't there and I can account for all the different times. And I got witnesses lined up, right? Five months later you told him that?

A: No, sir.

Q: But that's what he said?

A: Yes, that's what he said, yes.

Q: That's what he said, but he's a lier [sic]?

A: He is lying. He said it at a hearing where I was questioning his effectiveness. ...

The prosecutor then cross-examined Chmiel concerning the testimony of the prosecution witnesses, suggesting that "we have a lot of people that seem to be lying here." After Chmiel acknowledged that his brother Martin had never told him that he (Martin) had murdered the Lunarios, the prosecutor returned to the subject of Attorney Kennedy's testimony.

Q: Now this was a matter that you discussed with Mr. Kennedy, wasn't it?

A: That's correct.

Q: Because at a later date you came up with Story No. 3 where you said, you know what, Mr. Kennedy, you know what I'm going to say now? I'm going to turn the tables on Marty. I'm going to say Marty told me he did it and he did it with Buffton and some girl named Judy ... isn't that right?

A: No, sir, that's not right.

. . .

Q: Let me put it to you very simply. You came up with Story No. 1 which was: I was on the scene, and you tried to concoct different stories and different lies, deciding what you're going to tell when you get on the stand. Story No. 1 was: I was on the scene at 1:00 o'clock in the morning. I'm going to blame Marty because I know that Marty is blaming me, so I'm going to say I saw him running away and get in the Toyota. That's Story No. 1.

Five months later you come up with Story No. 2 which is: I was wrong about that. I wasn't on the scene, that I was at these other locations because you had time to get people together to put you at other locations, isn't that right?

A: No, sir.

Q: Then you say that after the preliminary hearing, after Marty testified against you, then you told him, didn't you tell him, Well, I'm going to turn the tables and I'm going to say that Marty told me he did it and he said that he and Buffton did it and they did it with a girl named Judy. Isn't that what you said?

A: No. Marty never told me he did it.

Q: I know that's what you're saying now, but that's Story No. 2 because I'm now reaching Story No. 3.

. . .

Q: Now you're aware that Mr. Kennedy said that you gave him a third version. And the third version was just that, that you claimed that Marty told you he did it. He testified to that under oath, didn't he?

A: Yes, he did.

Q: And he said that, I don't know what to do with this man. He's giving me three different stories. I can't put him on the stand to lie when he told me three different things. Isn't that what he said?

A: Yes, at that time—

Q: Of course he's a liar. He's a liar.

A: That's what he said. I did not tell him three different stories from the very first day; I told Mr. Kennedy what I remembered happened that night and what didn't happen.

. . .

Q: Okay. Let me refer to page 462 of the notes. The testimony of Mr. Kennedy under oath. Okay. He says several months later you told him, "He knows who did the murders but he won't say who did it. Naturally at this point I got a little excited, I pressed him on it. He identified the killers as two men and one woman. My notes indicate who did it. And he now says that Marty told him on September the 21st, 1983, the day after the killings, or the afternoon of that day of the killings, . . . that he, Marty, Tom Buffton, and Judy, I'm not sure who Judy was, did it.

That Marty Chmiel, this is now coming five months later and it's a, 'me, too' defense. Marty said Dave did it, and five months later Dave says, Oh, Marty did it. He told me he did it." Do you remember him testifying to that?

A: Yes.

Q: So he says that was your Story No. 3, is that right?

A: Yes, that's what he said, yes.

Q: And do you remember him saying on page 464, "I didn't know what he would say on the stand because now I have three versions: A. He was up there to case the joint; B. He wasn't up there but Marty—that he wasn't up there and he was at his friend's house; and, C. Marty did it.["] . . . [D]o you remember him testifying to that?

A: Yes.

. . .

Q: Do you remember him saying this, on page 545, "I had the problem as a lawyer being told by my client what had happened here, and I had the problem of supporting perjury if I knew he was going to take the stand and testify as to something that was not true." Do you remember him saying that?

A: Yes.

Chmiel mounts a two-pronged attack upon the Commonwealth's use of Attorney Kennedy's testimony. First, he argues that Attorney Kennedy's disclosures were excessive in scope and improper given their procedural context. Second, he contends that the trial court abused its discretion in allowing the Commonwealth to utilize Attorney Kennedy's testimony at the second trial. As the basis for this claim, Chmiel asserts that the Commonwealth's use of Attorney Kennedy's testimony violated 42 Pa.C.S. § 5917, the codification in the criminal context of the former testimony exception to the hearsay rule. In addition, he contends that the testimony did not meet the requirements for admissibility established by this Court in *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992). Finally, he asserts that admission of the

testimony violated his state and federal constitutional rights to confront the witnesses against him, to be protected against compelled self-incrimination, to have the assistance of counsel, and to be afforded procedural due process.

Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision on such a question absent a clear abuse of discretion. *Commonwealth v. Weber*, 549 Pa. 430, 436, 701 A.2d 531, 534 (1997). In addition, we will not reach Chmiel's constitutional issues if the appeal can be decided on another basis. *Commonwealth v. Baker*, 547 Pa. 214, 218, 690 A.2d 164, 165 (1997).

## II. Prior Counsel's Disclosure of Confidential Communications

It is undisputed that Chmiel's conversations with Attorney Kennedy were, and absent waiver would have continued to be, protected against compelled disclosure by the attorney-client privilege. Section 5916 of the Judicial Code, 42 Pa.C.S. § 5916, sets forth the privilege as it pertains to criminal matters in Pennsylvania.

> In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S. § 5916. Although now embodied in statute, the attorney-client privilege is deeply rooted in the common law. *Commonwealth v. Sims*, 513 Pa. 366, 373, 521 A.2d 391, 394 (1987); *Commonwealth v. Maguigan*, 511 Pa. 112, 124, 511 A.2d 1327, 1333 (1986). Indeed, it is the most revered of the common law privileges. *Maguigan*, 511 Pa. at 124, 511 A.2d at 1333.

[3] Nevertheless, a party who attacks the competence of his or her counsel cannot rely on the attorney-client privilege to prevent counsel from responding to such attack. *Loutzenhiser v. Doddo*, 436 Pa. 512, 519, 260 A.2d 745, 748 (1970);

*Doll v. Loesel,* 288 Pa. 527, 533, 136 A. 796, 798 (1927); *Commonwealth v. Warren,* 264 Pa.Super. 274, 279 n. 6, 399 A.2d 773, 776 n. 6 (1979); *Commonwealth v. McKenna,* 206 Pa.Super. 317, 322, 213 A.2d 223, 226 (1965). In effect, the client's attack on the competence of counsel serves as a waiver of the privilege as to the matter at issue.[2]

So much, Chmiel concedes. He contends, however, that Attorney Kennedy disclosed far more of his conversations with Chmiel than was necessary to rebut the allegations of ineffectiveness. Chmiel bases his claim on Rule 1.6(c)(3) of the Pennsylvania Rules of Professional Conduct, which provides that a lawyer whose representation of a client has been challenged "may reveal [confidential] information to the extent that the lawyer reasonably believes necessary" in order to respond to such a challenge. According to Chmiel, Attorney Kennedy could reasonably have responded to the allegations against him without disclosing that his client had given him three contradictory versions of the events in question.

Chmiel's argument is meritless. In response to the assertion that he had been ineffective in not calling Chmiel to the

2. As amended in 1995, the Post Conviction Relief Act specifically provides that "[w]hen a claim for relief is based on an allegation of ineffective assistance of counsel as a ground of relief, any privilege concerning counsel's representation *as to that issue* is automatically terminated." 42 Pa.C.S. § 9545(d)(3) (emphasis added). Although this statutory provision was not in effect in 1988, when the evidentiary hearing on Chmiel's ineffectiveness claims was held, there was already implicit in the case law the limitation that a client's attack on his former counsel's competence waived the privilege only as to the matter in dispute. *See Doll,* 288 Pa. at 533, 136 A. at 798 (finding that attack on attorney's integrity rendered admissible "at least part" of his testimony despite privileged nature of communications disclosed); *Warren,* 264 Pa.Super. at 279 n. 6, 399 A.2d at 776 n. 6 (finding that trial court had properly overruled appellant's objection, based on attorney-client privilege, to introduction at PCHA hearing of letter from appellant to former attorney, where letter confirmed attorney's testimony that appellant had sought to plead guilty in order to expedite sentencing); *see also Commonwealth v. Ferri,* 410 Pa.Super. 67, 75, 599 A.2d 208, 212 (1991) (finding that admission of former counsel's testimony was proper, where privileged communications were disclosed only to extent necessary to authenticate and establish chain of custody of non-privileged physical evidence), *appeal denied,* 534 Pa. 652, 627 A.2d 730 (1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 540 (1994).

stand, it was appropriate for Attorney Kennedy to state his view that, because his client had told him more than one version of the events at issue, he risked suborning perjury if he allowed his client to testify. It was also appropriate for Attorney Kennedy to respond to the allegation concerning alibi witnesses by explaining that his client had rendered the search for such witnesses more difficult by giving more than one version of his whereabouts on the night in question. While Attorney Kennedy might have been able to explain his dilemma using fewer details, the disclosures that did occur fell within the scope of the waiver.

■ Moreover, even if we were to assume for the sake of argument that Chmiel is correct, his claim would have established, at most, a basis for disciplinary proceedings against Attorney Kennedy. The rules that govern the ethical obligations of the legal profession (presently, the Rules of Professional Conduct) do not constitute substantive law. *In re Search Warrant B–21778*, 513 Pa. 429, 441 n. 5, 521 A.2d 422, 428 n. 5 (1987); *Estate of Pedrick*, 505 Pa. 530, 535, 482 A.2d 215, 217 (1984); *see also Rost v. State Board of Psychology*, 659 A.2d 626 (Pa.Cmwlth.) (addressing, in a disciplinary proceeding, a psychologist's breach of the duty of confidentiality), *appeal denied*, 543 Pa. 699, 670 A.2d 145 (1995). In addition, the discussion entitled "Scope" which precedes the Rules themselves states that "these Rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege." Accordingly, this claim is without merit.

Next, Chmiel challenges the trial court's finding that "the Defendant, by filing a PCHA petition in his first trial and including as grounds his prior counsel's failure to obtain alibi witnesses, opened the door for Attorney Kennedy's testimony. . . ." According to Chmiel, he filed a post-trial motion alleging ineffectiveness, not a PCHA petition, and therefore the trial court's decision to designate the evidentiary hearing as a PCHA hearing was error. The gravamen of Chmiel's argument, apparently, is that it is the PCHA designation that

determines whether counsel can reveal the confidences of a former client.

■ This argument is specious. Claims of ineffective assistance of counsel do not arise solely in the context of post-conviction proceedings. Such claims are often raised on direct appeal, and it cannot seriously be argued that the privilege would be waived in the former context but not in the latter. Regardless of whether the trial court's choice of procedure was "extremely unorthodox" and "unwarranted," as Chmiel suggests, the fact remains that Chmiel challenged the competence of his former counsel. It is that fact, and not the characterization of the proceeding, which "opened the door" to Attorney Kennedy's testimony.

## III. The Commonwealth's Use at Trial of Prior Counsel's Testimony

Having determined that Attorney Kennedy was properly allowed to testify as to otherwise privileged communications from Chmiel in order to rebut Chmiel's allegations of ineffectiveness, we turn to the fundamental issue in this case: Was it error for the trial court to allow the Commonwealth to introduce such testimony into Chmiel's second trial? This is a question of first impression not only in this Commonwealth, but, apparently, in almost all other jurisdictions as well.[3]

3. The Court of Appeals for the Third District of California considered the issue generally in *State v. Dennis*, 177 Cal.App.3d 863, 223 Cal.Rptr. 236 (1986). In that case, the court acknowledged that when a defendant asks the trial court to set aside a jury verdict on the ground of ineffectiveness of counsel, he waives the attorney-client privilege as to the matters that he places in issue. Nevertheless, the court observed, "the information that defendant will be required to disclose in support of a new trial motion may conceivably lighten the burden which the prosecution bears in bringing about a conviction upon a new trial and therefore defendant's right against self incrimination is implicated." *Id.* at 874, 223 Cal.Rptr. at 243. Thus, the court reasoned that to require a defendant to demonstrate prior counsel's ineffectiveness on the record was to risk imposing on the defendant "a compulsive sanction against the exercise of the self incrimination privilege." *Id.* at 874, 223 Cal.Rptr. at 243–44. In order to relieve defendants of such an untenable choice, the court held that a defendant "must be granted use immunity for disclosures he may make in support of a motion for a new

Before addressing Chmiel's arguments on this issue, we must determine the use that was made of the challenged testimony. As noted earlier, the Commonwealth asserted prior to trial that it would introduce the testimony for the purpose of impeaching Chmiel if he chose to testify, and in fact the Commonwealth did utilize the testimony for that purpose. Chmiel argues, however, that the testimony was effectively offered as substantive evidence since the trial court did not give any limiting instruction to the jury.[4]

Review of the jury charge reveals that the trial court gave two pertinent instructions to the jury. As part of its general instructions on credibility, the court stated the following:

According to the evidence some of the witnesses made a statement on one occasion which appeared to conflict or contradict their testimony given at this trial. That would be when they were on the stand and they said one thing while testifying, then they were asked about something they said regarding the same thing on a prior occasion. You may consider the evidence of this other statement in deciding whether or not to believe this witness. You may, if you choose, regard this evidence as proof of the truth of anything that the witness said in the earlier statement.

Later in the charge, after having explained to the jury that circumstantial evidence alone may be sufficient to prove the defendant's guilt, the court said the following:

We also want to caution you that there was evidence tending to show that the Defendant made false and contradictory statements. They were testified to by various witnesses in this case. So if you believe this evidence, you may

trial on grounds of ineffectiveness of trial counsel." *Id.* at 876, 223 Cal.Rptr. at 245.

4. Defense counsel did not ask for a limiting instruction, either at the time of cross-examination or prior to the court's charge to the jury. As this is a capital case, we conclude that the issue has not been waived. See *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Moreover, as will be discussed, defense counsel did object to the "consciousness of guilt" instruction that was given by the court on this issue.

consider it as tending to prove the Defendant's consciousness of guilt. You are not required to do so. You should consider and weigh this evidence along with all the other evidence in the case.

Obviously one example of Chmiel's "false and contradictory statements" was the varying accounts of his whereabouts contained in the testimony of Attorney Kennedy, which testimony was read to the jury by the prosecutor during his cross-examination of Chmiel.[5] Thus, the jury could fairly have found, based on the court's instruction, that such testimony constituted evidence tending to prove Chmiel's consciousness of guilt—in other words, substantive evidence. In light of this instruction, we do not agree with the trial court that Attorney Kennedy's testimony was used only for the purpose of impeachment.

■ As the Commonwealth acknowledges, the evidence in question involved two declarants, Chmiel and Kennedy, and was therefore hearsay within hearsay, or double hearsay. If double hearsay is to be admissible, the reliability and trustworthiness of each declarant must be independently established. *Commonwealth v. Scott*, 503 Pa. 624, 630, 470 A.2d 91, 94 (1983). This requirement is satisfied where each statement comes within an exception to the hearsay rule. *See Commonwealth v. Galloway*, 302 Pa.Super. 145, 158–59, 448 A.2d 568, 575 (1982); PACKEL AND POULIN, PENNSYLVANIA EVIDENCE § 806 (1987) [hereinafter PENNSYLVANIA EVIDENCE].

In the present case, the Commonwealth maintains that Attorney Kennedy's testimony comes within the former testimony exception to the hearsay rule and that Chmiel's statements to Attorney Kennedy constitute party admissions, another hearsay exception. Although he does not directly

---

5. In requesting the second of the quoted instructions, the Commonwealth explained that "what we are talking about there is the three versions that [Chmiel] gave with respect to Mr. Kennedy." The trial court suggested that the instruction would apply to the defendant's statements to his brother Martin. Over defense counsel's vigorous objection, the trial court agreed to include the Commonwealth's point for charge in its instructions.

address the hearsay rule, Chmiel indirectly challenges both of these assertions.

## A. Admissibility of Former Testimony Under 42 Pa.C.S. § 5917

We consider, first, Chmiel's claim that the Commonwealth's use of Attorney Kennedy's testimony violated Section 5917 of the Judicial Code, which reads as follows:

> Whenever any person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine, if such witness afterwards dies, or is out of the jurisdiction so that he cannot be effectively served with a subpoena, or if he cannot be found, or if he becomes incompetent to testify for any legally sufficient reason properly proven, notes of his examination shall be competent evidence upon a subsequent trial of the same criminal issue. For the purpose of contradicting a witness the testimony given by him in another or in a former proceeding may be orally proved.

42 Pa.C.S. § 5917. As noted earlier, Section 5917 codifies, in the criminal context, the former testimony exception to the hearsay rule. *See* PENNSYLVANIA EVIDENCE § 804.1.

■ This Court has held that in order for a witness's prior testimony to be admissible pursuant to Section 5917, the defendant against whom the testimony is to be admitted at a subsequent proceeding must have been afforded a full and fair opportunity to cross-examine the witness at the first proceeding. *Commonwealth v. Thompson*, 538 Pa. 297, 311, 648 A.2d 315, 322 (1994); *Commonwealth v. Bazemore*, 531 Pa. at 588, 614 A.2d at 687. This requires, essentially, that

> the issue remain the "same" in both proceedings. . . . This requirement is in accord with the common law rule that "the issues in the first proceeding and hence the purpose for which the testimony was there offered, must have been such that the present opponent (or some person in like interest)

had an adequate motive for testing on cross-examination the credibility of the testimony now offered." McCormick, Evidence § 234 at 491 (1954); 5 Wigmore, §§ 1386–88 (3 rd ed.1940).

*Commonwealth v. Velasquez,* 449 Pa. 599, 601 n. 3, 296 A.2d 768, 770 n. 3 (1972) (additional citations deleted). Addressing Section 5917's predecessor statute, the Act of May 23, 1887, P.L. 158, § 3, 19 P.S. § 582, the wording of which was in pertinent part identical to that of Section 5917, this Court interpreted the statute as requiring that the issues at both proceedings be "substantially the same." *Velasquez,* 449 Pa. at 601, 296 A.2d at 770.[6]

■ Chmiel does not dispute that Attorney Kennedy was examined as a witness in a criminal proceeding before a court of record, or that he has since died. He contends, rather, that the ineffectiveness hearing did not address the same criminal issue as his subsequent trial on homicide charges. According to Chmiel, the issue at the evidentiary hearing was Attorney Kennedy's effectiveness at the first trial, and such issue does not imply the commission of a crime or the threat of criminal punishment; the issue at the second trial, in contrast, was Chmiel's guilt or innocence of three charges of murder in the first degree. Therefore, Chmiel argues, it cannot be said that

6. *See id.* (holding, in case of defendant who obtained new trial on murder charge after having pled guilty, that testimony of unavailable witness from degree of guilt hearing was admissible at trial because in both proceedings the issue was whether defendant had acted with premeditation and without provocation); *Commonwealth v. Taylor,* 299 Pa.Super. 113, 122–23, 445 A.2d 174, 178–79 (1982) (holding that testimony of unavailable witness from witness's own trial was admissible at defendant's trial, as both had asserted entrapment defense involving same informant). *Cf. Commonwealth v. Munchinski,* 401 Pa.Super. 300, 316, 585 A.2d 471, 479 (1990) (holding that testimony from trial of unavailable witness and former co-defendant was not admissible at defendant's trial, as witness had presented insanity defense and Commonwealth's opportunity to cross-examine was limited to that issue alone), *appeal denied,* 529 Pa. 618, 600 A.2d 535 (1991); *Commonwealth v. DeMarco,* 332 Pa.Super. 315, 332, 481 A.2d 632, 640 (1984) (holding that transcript from Canadian extradition hearing was not admissible at the defendant's trial in Pennsylvania on criminal charges, despite adversarial nature of extradition hearing, because interests of Canadian authorities at hearing were substantially different from those of Commonwealth at trial).

the hearing afforded him a full and fair opportunity to cross-examine Attorney Kennedy on the issue that was fundamental to his second trial. We disagree.

The issue at the second trial, as at the first, was Chmiel's guilt or innocence of three charges of first-degree murder. The issue at the evidentiary hearing was Attorney Kennedy's effectiveness in defending Chmiel against those charges at the first trial. Central to both issues was Chmiel's credibility: Was he to be believed when he testified concerning his whereabouts on the night in question? As Attorney Kennedy's testimony on this issue was decidedly negative, Chmiel's motive for cross-examining Attorney Kennedy is readily apparent.

The fact that Attorney Kennedy would not face criminal punishment if found to be ineffective is, as to this issue, irrelevant. It was not the significance of the hearing to Attorney Kennedy that mattered, but the significance of the hearing *to Chmiel.* If Chmiel succeeded in demonstrating prior counsel's ineffectiveness with respect to the investigation of alibi witnesses, his own desire to take the stand, or any of the other asserted grounds, he would obtain a new trial (as, indeed, he did on the ground of failure to request an accomplice instruction). A new trial would afford him not only a second chance for acquittal but also, failing that, a second chance at a sentence of life imprisonment rather than death. It was therefore in Chmiel's interest to impeach or disprove Attorney Kennedy's testimony concerning each and every allegation of ineffectiveness. Indeed, a more compelling motive for effective cross-examination is difficult to imagine. Therefore, as Chmiel had both the motive and the opportunity to cross-examine Attorney Kennedy at the evidentiary hearing, Section 5917 did not bar the admission of Attorney Kennedy's testimony at Chmiel's second trial.

Chmiel cites this Court's decision in *Commonwealth v. Mangini,* 493 Pa. 203, 425 A.2d 734 (1981), for the proposition that "countervailing principles" may preclude the admission of prior recorded testimony even though such testimony was otherwise admissible under Section 5917. The issue in *Man-*

*gini* was whether the testimony of a currently unavailable witness, given at the defendant's first trial, could be introduced at the defendant's second trial, where the second trial had been made necessary by prior counsel's ineffectiveness in failing either to request a competency hearing for the witness in question or to object to his competency on the record. This Court held that the testimony could not be so utilized, as "the use in the present trial of the very testimony which has been indelibly stamped with prior counsel's ineffectiveness is offensive to our sense of justice and the notion of fair play." *Id.* at 210, 425 A.2d at 738.

Chmiel asserts that the same result is required here. In *Mangini,* however, this Court cautioned that "our holding today is not a per se rule requiring exclusion of any testimony from a prior trial wherein trial counsel had been ineffective." *Id.* at 212, 425 A.2d at 739. The Court explained that, to the contrary, the resolution of a similar claim in a different case would require an examination of "[a]ll of the factual variables ... to determine if the ineffectiveness so tainted the testimony sought to be introduced as to affect its reliability or to otherwise render its subsequent use unfair." *Id.* at 212, 425 A.2d at 738 (footnote omitted).

In the present case, prior counsel was found to have been ineffective at the first trial only because he did not request a particular jury instruction. Counsel's failure in that regard did not taint the evidence offered at the first trial. In any event, it was not testimony from the first trial that was introduced at the second trial, but prior counsel's testimony from the evidentiary hearing. Although prior counsel's ineffectiveness made such hearing necessary, it did not taint the testimony offered there.[7] Thus, neither case law nor logic warrants the extension of *Mangini* to the present situation.

## B. Admissibility of Former Testimony under *Lively*

Next, Chmiel argues that, under this Court's decision in *Commonwealth v. Lively,* 530 Pa. 464, 610 A.2d 7 (1992),

---

7. The fact that the evidentiary hearing was necessitated by prior counsel's ineffectiveness is nevertheless relevant to our disposition in another respect. *See* Section III.C, *infra.*

Attorney Kennedy's ineffectiveness hearing testimony was inadmissible at trial because it was based on the attorney's notes of his conversations with Chmiel. We disagree.

The decision in *Lively* followed from the lead case of *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986), which held that prior inconsistent statements of a non-party witness may be used as substantive evidence where the declarant is a witness at trial and available for cross-examination. While acknowledging the traditional view that such statements were hearsay if offered for truth and, as hearsay, were too unreliable to be admitted as substantive evidence, this Court nevertheless concluded that since the witness in question would testify in court, where she would be under oath and subject to cross-examination, the acknowledged dangers of hearsay were largely nonexistent. *Id.* at 128–29, 507 A.2d at 69.

*Lively* limited the rule of *Brady* by holding that a prior inconsistent statement of a non-party witness may be used as substantive evidence only if it was given under highly reliable circumstances: 1) under oath at a formal legal proceeding; 2) reduced to a writing signed and adopted by the declarant; or 3) recorded verbatim contemporaneously with the making of the statement. *Id.* at 471, 610 A.2d at 8.

In the present case, Chmiel contends that Attorney Kennedy became a non-party witness for purposes of the second trial. Chmiel argues that because he did not adopt Attorney Kennedy's notes in any fashion, and in fact denied making the statements attributed to him by Attorney Kennedy, the notes themselves would be inadmissible. Therefore, he asserts, Attorney Kennedy's testimony should be inadmissible as well.

The principles of *Brady* and *Lively* are not relevant, however, unless the matter at issue involves the prior inconsistent statement of a non-party witness. Here, however, Attorney Kennedy made no prior inconsistent statement; only his testimony from the evidentiary hearing was utilized at Chmiel's second trial. Therefore, Attorney Kennedy cannot be the non-party witness for purposes of a *Brady-Lively* analysis.

Moreover, his recorded testimony, as noted earlier, was admissible under the former testimony exception as codified in Section 5917.

Chmiel did make prior inconsistent statements, in the form of his statements to Attorney Kennedy; and those statements were effectively allowed into evidence at his second trial. Chmiel, however, was not a non-party witness. To the contrary, he was the defendant, and his statements to Attorney Kennedy were admissible under the hearsay exception for party admissions. *Commonwealth v. Sherard,* 456 Pa. 505, 508, 321 A.2d 372, 373 (1974); *see also Galloway,* 302 Pa.Super. at 158, 448 A.2d at 575.

> [Party a]dmissions ... are admissible because it is fair in an adversary system that a party's prior statements be used against him if they are inconsistent with his position at trial. In addition, a party can hardly complain of his inability to cross-examine himself. A party can put himself on the stand and explain or contradict his former statements.

PENNSYLVANIA EVIDENCE § 805 (footnotes omitted). In sum, as the reliability concerns underlying *Brady* and *Lively* are not present here, the *Brady-Lively* precedents pose no barrier to the admissibility of Attorney Kennedy's testimony.

## C. Asserted Denial of Constitutional Rights

Chmiel argues that even if the Commonwealth's use at trial of Attorney Kennedy's testimony surmounted the statutory and common law bars to admissibility, it cannot overcome the hurdle of constitutionality. Among the constitutional rights violated by the use of such testimony, Chmiel contends, was the right, guaranteed him by the Sixth Amendment to the United States Constitution[8] and Article I, Section 9[9] of the Pennsylvania Constitution, to confront the witnesses against him.

8. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."

9. "In all criminal prosecutions the accused hath a right ... to meet the witnesses face to face...."

Although the hearsay rules and the federal Confrontation Clause are generally designed to protect similar values, the overlap is not complete. *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). The United States Supreme Court "has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that 'a primary interest secured by [the provision] is the right of cross-examination.'" *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980) (quoting *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965)).

In *Roberts,* the Supreme Court explained that "[t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay." *Id.* at 65, 100 S.Ct. at 2538. First, it establishes a "rule of necessity": in the usual case, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* Second, once the declarant is shown to be unavailable, the Clause requires that the declarant's statement be shown to bear adequate "indicia of reliability" if it is to be admitted into evidence. *Id.* at 66, 100 S.Ct. at 2539.

Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* (footnote omitted).

■■■ While it is thus within the realm of possibility that an otherwise admissible out-of-court statement could run afoul of the defendant's constitutional right to confrontation, Chmiel has failed to demonstrate that this has occurred in the present case. The witness in question was unavailable; the witness's testimony met the requirements for admissibility set forth in Section 5917 of the Judicial Code, including the requirement that Chmiel be given a full and fair opportunity to cross-examine the witness; and Chmiel's statements to the witness came within the recognized hearsay exception for party admissions. As Chmiel's argument for inadmissibility under the

federal Confrontation Clause is not distinguishable from his argument for inadmissibility under Section 5917, his reliance upon the former is without merit.

Chmiel also maintains, correctly, that this Court has interpreted the Confrontation Clause of our state Constitution as being more stringent than its federal counterpart. *Commonwealth v. Louden*, 536 Pa. 180, 187, 638 A.2d 953, 956–57 (1994); *Commonwealth v. Ludwig*, 527 Pa. 472, 478, 594 A.2d 281, 283–84 (1991). He does not assert that Section 5917 violates the state constitutional provision, however, but only that the procedure at issue in this case did not meet the requirements of Section 5917. In Section III.A, *supra*, we have found that argument to be meritless. Moreover, as this Court observed in *Ludwig*, "we have recognized exceptions to the constitutional right to confrontation . . . only in those instances in which the accused has already had the opportunity to confront the witnesses against him face to face." *Id.* at 480, 594 A.2d at 284. Chmiel had such an opportunity at the evidentiary hearing. Accordingly, this issue requires no further consideration.

Chmiel also argues that the use of Attorney Kennedy's testimony at his second trial violated his Fifth Amendment right to be protected against compelled self-incrimination.[10] He contends that through the compelled disclosure of the statements that he had made in confidence to Attorney Kennedy, "Kennedy became Chmiel incriminating himself."

At first blush, Chmiel's argument appears to be contradicted by case law. The defendant in *Commonwealth v. Boyle*, 498 Pa. 486, 447 A.2d 250 (1982), chose to testify at his first trial but to remain silent at his second trial. At the second trial, the Commonwealth, over the defendant's objection, was permitted to admit into evidence certain portions of the defendant's testimony at earlier proceedings, including the first trial, to show that he had made conflicting statements and thus to imply consciousness of guilt. This Court affirmed, explaining that

10. "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."

[t]he fact that [the defendant] exercised his right of silence during the second trial did not insulate him from the consequences of his earlier testimony. It has long been recognized that testimony from an earlier trial may be introduced in the prosecution's case against a defendant regardless of whether that defendant takes the stand or not in the second proceeding.

*Id.* at 497, 447 A.2d at 256 (citations omitted). As the Superior Court had held in *Commonwealth v. House,* 6 Pa.Super. 92 (1897),

[A defendant] cannot be compelled to give evidence against himself, but if he gives it voluntarily he cannot object to having it used against him. His constitutional privilege, as far as that testimony is concerned, is waived, and cannot be reclaimed in any subsequent trial of the same indictment.

*Id.,* 6 Pa.Super. at 104, *quoted with approval in Boyle,* 498 Pa. at 498, 447 A.2d at 256.

Of similar import, although involving a different privilege, is the case of *Commonwealth v. Santiago,* 541 Pa. 188, 662 A.2d 610 (1995), *cert. denied,* 516 U.S. 1053, 116 S.Ct. 722, 133 L.Ed.2d 674 (1996). The defendant in that case argued that the trial court had erred in admitting psychiatric testimony, introduced in his first trial where insanity was the defense, into his second trial, where he did not assert such a defense. Citing its earlier decision in *Boyle,* this Court concluded that "because Appellant voluntarily waived the psychiatrist-patient privilege, 42 Pa.C.S. § 5944, by pursuing an insanity defense in his first trial, he may not reclaim the privilege in a subsequent trial." *Id.* at 197–98, 662 A.2d at 614 (footnote omitted).

These decisions imply that, absent other considerations, a right or privilege once waived is always waived and that the defendant who waives a right or privilege cannot thereafter object to the use that is made of the formerly privileged communications. Although Chmiel did not waive his attorney-client privilege directly, he did so indirectly for the purpose of demonstrating his prior counsel's ineffectiveness. The Com-

monwealth argues that the evidence that resulted from such waiver "no longer retain[ed] its privileged character once it was disclosed in open court for third parties to hear."

Chmiel argues, however, that another, crucial consideration was present in this case: his constitutional right to the assistance of counsel. He asserts that "it is precisely because he chose to exercise his right to effective counsel by challenging his former attorney's performance that he ended up in a quagmire of repercussions." One such repercussion, he maintains, was the violation of his Fifth Amendment right not to incriminate himself. "Does a defendant really have a right to effective assistance of counsel," he asks, "if, by challenging his attorney's performance, he runs the risk of having his confidences used against him at a second trial?"

In effect, Chmiel posits that, if the trial court's ruling is affirmed, a defendant who was represented by ineffective counsel will face a constitutionally impermissible choice: he can challenge the effectiveness of prior counsel, at the risk that the confidences which will be disclosed in the process will be admitted against him at a second trial; or he can ensure that his statements to prior counsel remain confidential, at the cost of forgoing any possibility of a new trial at which he would be effectively represented.

The importance of the right to counsel requires that we give careful consideration to Chmiel's argument. For at least thirty-five years the right to counsel has been recognized as a fundamental right, one that is essential to the goal of ensuring that every criminal defendant receives a fair trial before an impartial tribunal. *See Gideon v. Wainwright*, 372 U.S. 335, 344–45, 83 S.Ct. 792, 796–97, 9 L.Ed.2d 799 (1963). Moreover, "[i]t is axiomatic that a criminal defendant is constitutionally entitled to the *effective* assistance of counsel." *Commonwealth v. Kale*, 331 Pa.Super. 155, 161, 480 A.2d 291, 294 (1984) (emphasis added) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980)). It is a matter of grave concern, therefore, if a defendant in Chmiel's situation chooses not to seek the effective represen-

tation to which he is entitled because he fears that the price of success will be his compelled self-incrimination, through the testimony of prior counsel, upon retrial.

 The rationale underlying the attorney-client privilege suggests that there is reason for such concern. The purpose of the privilege is not to further the fact-finding process, but to foster a confidence between attorney and client that will lead to a trusting and open dialogue. *Sims,* 513 Pa. at 374, 521 A.2d at 394; *Maguigan,* 511 Pa. at 125, 511 A.2d at 1334. As explained by Professor Mechem in his treatise on the law of agency:

> The purposes and necessities of the relation between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosures to the attorney of the client's objects, motives and acts. This disclosure is made in the strictest confidence, relying upon the attorney's honor and fidelity. To permit the attorney to reveal to others what is so disclosed, would be not only a gross violation of a sacred trust upon his part, but it would utterly destroy and prevent the usefulness and benefits to be derived from professional assistance. Based upon considerations of public policy, therefore, the law wisely declares that all confidential communications and disclosures, made by a client to his legal adviser for the purpose of obtaining his professional aid or advice, shall be strictly privileged;— that the attorney shall not be permitted, without the consent of his client,—and much less will he be compelled—to reveal or disclose communications made to him under such circumstances.

*Sims,* 513 Pa. at 373–74, 521 A.2d at 394 (quoting 2 MECHEM ON AGENCY § 2297 (2d ed.1914)); *Maguigan,* 511 Pa. at 124–25, 511 A.2d at 1333–34 (quoting same); *Slater v. Rimar, Inc.,* 462 Pa. 138, 148, 338 A.2d 584, 589 (1975) (quoting same).

It has been suggested that the reluctance of clients to disclose unfavorable information to counsel is even more pronounced in the criminal field. "In criminal cases, the difficulty of obtaining full disclosure from the accused is well known,

and would certainly become an absolute impossibility if the defendant knew that the lawyer could be compelled to report what he had been told." 1 McCORMICK ON EVIDENCE § 87 (4 th ed.1992). The critical importance of the attorney-client privilege to the administration of the criminal justice system is indicated not only by its ancient lineage, but also by its codification in statute. "[T]he existence of a statutory privilege is an indication that the legislature acknowledges the significance of a particular interest and has chosen to protect that interest." *Commonwealth v. Wilson*, 529 Pa. 268, 282, 602 A.2d 1290, 1298, *cert. denied*, 504 U.S. 977, 112 S.Ct. 2952, 119 L.Ed.2d 574 (1992).

Given the concerns that mandate recognition of an attorney-client privilege, it is not unrealistic to suggest that use of testimony of prior counsel as in this case would have a chilling effect on defendants' exercise of their right to the effective assistance of counsel. Knowing of the possibility that his counsel may ultimately be required to testify against him,[11] a defendant may decide that counsel cannot be trusted with the most damaging information concerning his case; or he may decide not to challenge counsel's effectiveness, fearing that his ability to mount a successful defense at a second trial has been fatally undermined by the admissibility of his communications to prior counsel. The fundamental unfairness of requiring a defendant to choose either of those options is illustrated by the present case: the situation that such a choice seeks to avoid—the admission at a second trial of prior counsel's evidentiary hearing testimony—has occurred precisely because prior counsel was shown to have been ineffective.

Arguably a defendant can avoid such an undesirable result by limiting his disclosures to his attorney, or by raising only such ineffectiveness claims as will not lead to the disclosure of incriminating statements. Such argument, in our view, presupposes an unrealistic degree of foresight on the part of the

11. By happenstance, this case presents a situation in which prior counsel, having died, was not available to testify at the defendant's retrial. In the more usual scenario, prior counsel will be available to testify in person against the defendant.

defendant and unreasonably restricts his ability to prepare an adequate defense.

Accordingly, we hold that the policy inherent in the legislative recognition and judicial enforcement of the attorney-client privilege, as it implicates a defendant's exercise of the right to the effective assistance of counsel and to freedom from compelled self-incrimination, restricts the use as well as the scope of permitted disclosures. Just as an attorney may not respond to allegations of ineffectiveness by disclosing client confidences unrelated to such allegations, so the client confidences properly disclosed by an attorney at an ineffectiveness hearing may not be imported into the client's subsequent trial on criminal charges. The trial court's decision to the contrary in the present case was error.

Such error was not harmless unless the Commonwealth is able to prove beyond a reasonable doubt that the error did not contribute to the verdict. *Commonwealth v. Story*, 476 Pa. 391, 409, 383 A.2d 155, 164 (1978). On this record, the Commonwealth cannot do so. Martin Chmiel testified that David Chmiel confessed to having committed the murders; David testified that he did not commit the murders but that he believed that Martin had done so. Although the record contained circumstantial evidence to support Martin's testimony, the credibility of the principal witnesses was nevertheless crucial. The damaging effect of Attorney Kennedy's testimony on the credibility of David Chmiel is beyond dispute, and the admission of such testimony was therefore not harmless.

Our decision requires that we vacate the judgment of sentence imposed upon David Chmiel and remand for a new trial. In doing so, we note that "there is little difference as far as the Constitution is concerned between permitting prior inconsistent statements to be used only for impeachment purposes, and permitting them to be used for substantive purposes as well." *Green*, 399 U.S. at 164, 90 S.Ct. at 1938 (citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). Given the extremely prejudicial nature of a defen-

dant's prior inconsistent statements as testified to by the defendant's former counsel, we conclude that to ask the jury to consider former counsel's testimony for the purpose of impeachment but not as substantive evidence would be to ask the impossible. Accordingly, Attorney Kennedy's testimony shall not be utilized for any purpose at retrial.

The judgment of sentence is vacated and the case is remanded to the trial court for further proceedings consistent with this Opinion.

Justice CASTILLE files a dissenting opinion in which Justice NEWMAN joins.

CASTILLE, Justice, dissenting.

The majority holds that to allow the now deceased counsel's testimony from a prior ineffectiveness hearing to be used to impeach appellant at his second trial would violate appellant's Sixth Amendment right to counsel. The majority reasons that allowing the use of such testimony would result in criminal defendants having the Hobson's choice of deciding whether to disclose information covered by the attorney-client privilege for the purpose of proving an ineffectiveness claim, knowing that the disclosures could be used against them in a later proceeding, or to refrain from bringing an ineffectiveness claim, thereby possibly giving up their right to the effective assistance of counsel under the Sixth Amendment. In so holding, the majority is effectively permitting appellant to resurrect a waived attorney-client privilege in order to prevent counsel's sworn testimony from the ineffectiveness hearing to be used to impeach appellant's perjurious testimony at his second trial. I respectfully dissent because subsequent use of this testimony (which was initially obtained pursuant to a waiver of the attorney-client privilege and made part of the public record on a meritless ineffectiveness claim) does not implicate appellant's Sixth Amendment right to counsel. The right to effective assistance of counsel does not encompass the right later to testify falsely under oath once the ineffectiveness claim has been asserted.

Initially, appellant sought to prevent the disclosure of his trial counsel's testimony, arguing that the attorney-client privilege barred such disclosure.[1] It is axiomatic that the attorney-client privilege is intended to foster candid communications between legal counsel and the client so that counsel can provide legal advice based upon the most complete information possible from the client. The historical concern has been that, absent the attorney-client privilege, the client may be reluctant to fully disclose all the facts necessary to obtain informed legal advice if these facts may later be exposed to public scrutiny.

The attorney-client privilege, however, is not an absolute privilege. The privilege is not available to protect attorney-client communications where the client attacks the effectiveness of the attorney's representation. *Loutzenhiser v. Doddo,* 436 Pa. 512, 518, 260 A.2d 745, 748 (1970). In addition, once the attorney-client communications have been disclosed to a third party, the privilege is deemed waived. *See United States v. Fisher,* 692 F.Supp. 488, 494 (E.D.Pa.1988)(any voluntary disclosure by the holder of the privilege that is inconsistent with the confidential nature of the relationship thereby waives the privilege).

Here, appellant challenged trial counsel's stewardship after his first trial, by alleging, *inter alia,* that his trial counsel was ineffective for failing to call him as a witness on his own behalf and for failing to present certain alleged alibi witnesses. In order to rebut the charges of ineffectiveness, trial counsel testified under oath at the evidentiary hearing on his effectiveness that he chose not to present appellant as a witness or to pursue an alibi defense because appellant, in preparation for trial, had told him three contradictory versions of his whereabouts at the time of the crime. Specifically, trial counsel testified that appellant first told him that he was near the victims' residence, casing it out for a future robbery, when he saw his brother, Martin Chmiel, emerge from the house, run down an alley, and disappear into a waiting car. Five months later, appellant informed trial counsel that he had not been at

1. The attorney-client privilege is codified at 42 Pa.C.S. § 5916.

the crime scene that night at all, but rather was in the company of various other persons throughout the course of the night. Appellant's third statement regarding the killing was that his brother had confessed to him that he and two accomplices had killed the victims.

Notwithstanding the disclosure of these communications in open court that included appellant's initial statement that he had been at the crime scene on the night of the murders, appellant took the stand at his second trial and testified that he had *not* been in the vicinity of the crime scene when the murders were committed. The Commonwealth then sought to impeach appellant with trial counsel's testimony from the ineffectiveness hearing where counsel testified that appellant told him that he *had* been present at the crime scene.

The trial court allowed such cross-examination. The majority now finds that the trial court erred in so doing because such practice would have a "chilling effect" on a party's assertion of his Sixth Amendment right to effective counsel. Thus, the issue becomes whether otherwise public, relevant information which would bear directly upon appellant's credibility should be excluded from a subsequent trial because the information was made public in order for appellant to raise an ineffective assistance claim. I would allow such communications to be used against the defendant at a later proceeding.

A defendant's Sixth Amendment right to counsel entitles him to allege and attempt to prove that his counsel was ineffective during the course of the representation. Apparently, the Majority here believes that, by allowing appellant's trial counsel to furnish impeachment testimony at his retrial, there would be a chilling effect on appellant's right to the effective assistance of counsel by, *inter alia*, rendering it less likely that he would ever choose to bring an ineffectiveness claim in the first place following a finding of guilt. As a matter of logic, the Majority's reasoning is quite simply incorrect, for reasons which I state below. As a matter of policy, the Majority's reasoning troubles me greatly, as I believe it is tantamount to placing this Court's judicial imprimatur on the practice of perjury in the Commonwealth.

First, appellant himself has defeated the notion that he would not bring a claim of ineffective assistance knowing that his attorney might be allowed to provide impeachment testimony against him if he won a retrial and then tried to change his defense. Quite simply, appellant *did* bring an ineffectiveness claim under such circumstances. It is inconceivable to me that this Court would order a new trial on the basis of a "chilling" of appellant's Sixth Amendment right when appellant quite clearly exercised that right as vigorously as it can be exercised. Moreover, it is equally inconceivable that *any* criminal defendant in appellant's situation would ever decline to bring a meritorious claim of ineffective assistance on the grounds that such a course of action might impair the defendant's freedom of imagination in the event that the defendant won a new trial. I do not believe I am making a bold prediction when I suggest that defendants will find the alternative of death by lethal injection to be less palatable than the prospect of bringing a claim of ineffective assistance while knowing that they will not be able to concoct a new story inconsistent with what they have already told their attorneys. Consequently, I believe that the Majority's concerns related to the putative chilling effect on appellant's Sixth Amendment rights are logically unsound.[2]

Second, I am troubled by what I perceive to be the policy ramifications of the Court's decision. It is beyond peradven-

---

2. To the extent that the Majority rests its decision on the chilling effect on a defendant's ability to be candid with his attorney in the first instance, I would note again that the unsettled state of the law in this area did not exactly impair appellant from testing out with his attorney the various versions of his defense. Moreover, affirmation in this matter would have no chilling effect whatsoever on the ability of *any* criminal defendant to be candid with his attorney, since the only purpose behind the Commonwealth's use of trial counsel as an impeachment witness was to show either that appellant was not candid with his attorney or else that he was not candid with the Court under oath. If appellant tells his attorney the truth and tells the Court the truth on retrial, then there will be no purpose to calling the attorney as an impeachment witness, and the spirit of full candor will be vindicated. By prohibiting the attorney from testifying in these circumstances, this Court necessarily condones one of two things: either a duplicitous relationship between the defendant and his trial counsel or a duplicitous relationship between the defendant and the Court.

ture that the attorney-client privilege is waived when a criminal defendant brings a claim of ineffective assistance of counsel. Essentially, the Court's decision today resuscitates the already-waived attorney-client privilege under the guise of protecting the defendant's Sixth Amendment right to effective assistance of counsel and concomitant right to seek a new trial. What the Court is really protecting, however, is not the right of a criminal defendant simply to seek a new trial, but rather the right to seek a new trial in which he is free to commit perjury without consequences. The attorney-client privilege should not provide a cloak of immunity for such a nefarious purpose. Once the privilege is waived for purposes of an ineffectiveness claim, it should remain waived for purposes of cross-examination in a second trial, rather than act as a shield which prevents the factfinder from being exposed to the defendant's naked perjury. The purpose of the privilege is to promote *candor* with one's attorney; the only situation in which an attorney will be called as an impeachment witness is a situation like this in which the defendant has already abused the concept of candor (by lying to either the attorney, the court, or both) and, therefore, subverted the very basis for assertion of the privilege in the first place. To be succinct, judicial expansion of the traditional attorney-client privilege is inappropriate at best when the very point of the expansion seems to be to facilitate the deception of the judicial system itself by prevaricating defendants. Accordingly, I believe that policy considerations militate heavily against the decision of the Majority.

In sum, for reasons of logic and of policy, I would affirm the judgment of sentence. I respectfully dissent.

Justice NEWMAN joins this dissenting opinion.